[No. 41851.    En Banc.    April 6, 1972.]

MAE WEAVER et al., *Petitioners*, v. DANIEL J. EVANS
*et al., Respondents.*

*Roberts, Shefelman, Lawrence, Gay & Moch,* by *George
M. Mack* and *Lee R. Voorhees, Jr.,* for petitioners.

*Slade Gorton, Attorney General, Robert F. Hauth* and
*Richard M. Montecucco, Assistants,* for respondents.

HAMILTON, C.J.—This cause comes to this court by way
of an original petition for a writ of mandamus. Petitioners,
by their application, would require the Governor of the
State of Washington, the Honorable Daniel J. Evans; the
State Treasurer, the Honorable Robert S. O'Brien; and the
Director of Program Planning and Fiscal Management, Mr.
Walter C. Howe, Jr., to allot and transfer to the Washing-
ton State Teachers' Retirement System (hereafter referred

to as the retirement system) certain general fund moneys appropriated to that system by Laws of 1969, Ex. Ses., ch. 282, p. 2708. The transfer of funds, restoration of which is sought, was withheld by order of the Governor, acting pursuant to RCW 43.88.110, on the grounds that available state revenues were insufficient to meet projected expenditures under general fund appropriations for the 1969-71 biennium. In addition, petitioners requested that the board of trustees of the retirement system be directed to restore to the system's Retirement Pension Reserve Fund (hereafter referred to as the pension reserve fund) any moneys transferred from that fund in order to meet any current pension payments following the Governor's order and prior to the issuance of any writ.

Respondents answered the petition, an agreed statement of facts was promulgated, extensive briefs were submitted, and oral arguments were presented to the court sitting en banc. Subsequent to oral argument and following careful and extensive conference consideration, a majority of the members of the court deemed that issues involved in this matter were of broad and urgent public import, in that a resolution thereof could affect the legislative budgetary planning process, and that the public interest would best be served by expeditiously disposing of the pertinent issues pending deliverance of a written opinion. A writ of mandamus was thereafter issued granting the relief sought by petitioners as outlined above, with an opinion expressing the reasons for the court's action to follow.

The agreed facts giving rise to this litigation may be summarized in the following manner:

Petitioner Mae Weaver is a retired teacher, a member of the retirement system, is qualified to receive and does receive pension benefits from that system, and brings this action on behalf of herself and all persons similarly situated. Petitioner Edgar H. Osborn is a certified and employed teacher, a member of the retirement system with a vested right to receive pension benefits thereunder at such time as he may properly qualify therefor, and joins in this

action on behalf of himself and all teaching members of the system. Petitioner Washington Education Association, a nonprofit corporation, is a statewide organization having members who are certified employees of various school districts most of whom are members of the retirement system, and the association participates in this action on behalf of such members.

Respondents, other than Governor Evans, Treasurer O'Brien, and Director Howe, are the duly appointed and acting members of the board of trustees of the retirement system and as such are trustees of the various funds established thereunder.

The legislature, by Laws of 1969, Ex. Ses., ch. 282, p. 2708, appropriated $62,069,296 to the retirement system for the biennium ending June 30, 1971. Pursuant to RCW 41.32.401 the transfer of funds under this appropriation from the state general fund to the retirement system was to be on a quarterly basis at the direction of and at a rate determined by the system's board of trustees. The quarterly transfers were to be computed upon the basis of the members' total earnable compensation received during the quarter, as reflected by the members' total quarterly contributions. The statute further provides that the amounts so transferred be distributed first to the teachers' retirement fund for the payment of current pensions, survivors' benefits, and the state's share of the operating expenses for the system, with the balance to be credited to the pension reserve fund. By December, 1970, $41,757,103 had been so allocated or transferred from the general fund.

In a letter dated December 24, 1970, the Governor advised the retirement system's board of trustees that in order to prevent state expenditures exceeding available revenues, he deemed it necessary to revise allotments from the general fund, and that for the remainder of the 1969-71 biennium transfers from the general fund to the retirement system would be curtailed in the amount of $20,312,193, the balance remaining of the 1969 legislative appropriation. Subsequently, on December 29, 1970, the Governor modi-

fied his decision by allotting $2,230,000 of the appropriation to permit the system to meet current obligations through January, 1971. The net result of the Governor's action, therefore, was to curtail the transfer of $18,082,193 of the initial appropriation from the general fund to the retirement system.

Upon being advised of the Governor's action, the board of trustees ascertained that for the remainder of the biennium, i.e., between January 31, 1971, and June 30, 1971, $9,865,300 in pension benefits would become due and payable, while there was then only $37,224 remaining in the pension fund, the fund from which all pension benefits are disbursed. Consequently, the effect of the Governor's action was twofold: First, in order to meet current and ongoing pension obligations of the retirement system, the board of trustees would need to withdraw funds from the pension reserve fund; and, second, no additional moneys would be placed in the pension reserve fund for the remainder of the biennium.

Believing that they did not have authority to withdraw moneys from the pension reserve fund, the board of trustees sought an opinion on that question from the Attorney General's office. Upon being advised by the Attorney General that the board of trustees had implied authority to transfer funds from the pension reserve fund for the purpose of paying current pensions when appropriations or allotments were insufficient, the board adopted a resolution, under protest, directing a transfer of funds from the pension reserve fund to the pension fund sufficient in amount to pay pension obligations for the ensuing quarter.

This action then followed, resulting, as heretofore indicated, in the issuance of a writ of mandamus directing allotment of the $18,082,193 of the original appropriation to the retirement system, and restoration to the pension reserve fund of those moneys transferred therefrom pursuant to the action of the board of trustees.

At this point, a brief history of the retirement system and the evolution of the funding involved would appear to

be helpful in reaching a disposition of the issues involved.

The Laws of 1917, ch. 163, p. 744, was the first legislative enactment in this state to deal with teachers' retirement. It provided for the establishment and regulation of retirement funds in first-class school districts, created at the option of the board of directors and a majority of the teachers, and funded through teacher contributions, together with the interest derived from the investment thereof. Retirement benefits were in the form of an annuity. Pension benefits supported by employer contributions were not contemplated. Administration of the fund generated by the contributions was vested in a board of trustees, with authority to invest receipts in excess of $1,000 over estimated annual disbursements. The board was also empowered to sell securities to make up the deficit when estimated disbursements exceeded estimated receipts, and to pay annuities pro rata in case of insufficient funds.

Then, in Laws of 1919, ch. 150, § 5, p. 418, the legislature authorized estimated deficits to be made up by general tax levies within the school district, providing, however, that the amount of the levy should not exceed in any 1 year the amount contributed to the retirement fund by its members during the preceding fiscal year.

In 1923, the legislature, by Laws of 1923, ch. 187, p. 637, authorized a state teachers' retirement fund, essentially to embrace those teachers not covered by local retirement programs. It, too, was funded by member contributions and interest from investments, administered by a board of trustees, and provided only an annuity upon retirement. The board of trustees, like the local boards established under Laws of 1917, ch. 163, p. 744, was empowered to sell securities to meet deficits and to pay annuities pro rata when there was insufficient funds on hand to pay the annuities in full when due. No general tax revenues were authorized to supplement the members' contributions.

The teachers' retirement programs initiated by Laws of 1917, ch. 163, p. 744, and Laws of 1923, ch. 187, p. 637, continued in effect without substantial change until the

legislature in Laws of 1937, ch. 221, p. 1095, dissolved the local and state teachers' retirement funds, 'and created a comprehensive teachers' retirement system designated as the Washington State Teachers' Retirement System. This system embraced the annuity concept as well as a pension benefit upon qualified retirement. The act created four principal funds: The annuity fund, the pension fund, the disability reserve fund, and the expense fund, with the State Treasurer as the custodian thereof. The system was to be funded by member contributions as supplemented by designated appropriations from the general fund and allocations from the Revenue Act of 1935. Administration of the system and its funds was vested in 'a board of trustees, with authority to disburse by voucher the respective obligations accruing, to authorize investment of surplus funds, and to direct sale of securities when necessary. By section 12 of the act, the legislature appropriated any and all moneys in the respective funds to the payment of the retirement annuities, pensions, disability allowances and operational expenses, to be paid out upon board vouchers. Pensions under this act were defined as:

"Pensions" shall mean annual payments for life derived from money by allocation from the revenue act of 1935 'and money derived from contributions of members as provided in paragraph 4, subdivision (b) of section 6.

Laws of 1937, ch. 221, § 1 (17), p. 1097. No pension reserve fund was provided for.

The 1937 act was amended in varying respects by Laws of 1939, ch. 86, p. 222, and Laws of 1941, ch. 97, p. 231. Among the amendments was a slight redefinition of pensions 'and the creation of a pension reserve fund. Pensions by redefinition were said to be:

"Pensions" shall mean annual payments for life derived from money appropriated by the legislature, and from gifts and bequests, and any other funds hereafter set over to the pension fund, and money derived from contributions of members as provided in paragraph 4, subdivision (b) of section 6.

Laws of 1939, ch. 86, § 1(17), p. 224; Laws of 1941, ch. 97, § 1(17), p. 233.

The pension reserve fund was defined as follows:

"Pension Reserve" shall mean the fund established by appropriations made by the legislature to the pension fund of the retirement system to liquidate the accrued liabilities of the retirement system on the date it became effective, and to establish and maintain a reserve fund for payment of pensions under this act;

Laws of 1939, ch. 86, § 1(17a), p. 224; Laws of 1941, ch. 97, § 1(17a), p. 233.

In addition to these amendments the legislature impressed upon the board of trustees the duty to biennially prepare an estimate of the retirement system disbursements contemplated for the ensuing biennium, including "an amount calculated upon accepted tables for the purpose of establishing and maintaining a pension reserve fund as provided in subsection (17a), section 1, above." Upon completion of the estimate, it was to be transmitted to the Governor "with a showing of the total amount needed for the biennium to insure the full satisfaction" of the retirement allowances, which amount "shall" then be appropriated by the legislature to the pension fund of the retirement system. Laws of 1939, ch. 86, § 5 (§ 6(2)), p. 231; Laws of 1941, ch. 97, § 5 (§ 6(2)), p. 244. With respect to the pension reserve fund, the 1941 amendatory act further provided:

After this appropriation has been made to the pension fund of the retirement system, the Board of Trustees shall transfer to the pension reserve fund the amount provided for such transfer.

Laws of 1941, ch. 97, § 5 (§ 6(2)), p. 244.

The system remained unchanged until 1947, when by Laws of 1947, ch. 80, p. 549, the legislature repealed its prior enactments of 1937, 1939, and 1941, and enacted legislation creating a new retirement system, although retaining many of the aspects of the 1937 system as amended. This act created two principal funds into which all assets of the

system were to be deposited, the teachers' retirement pension reserve fund and the teachers' retirement fund. The teachers' retirement fund was subdivided into four separate funds, the annuity fund, the pension fund, the disability reserve fund, and the expense fund. The terms "pension," "pension fund," and "pension reserve fund" were defined as follows:

"Pension" means the moneys payable per year during life from the pension fund.

"Pension Fund" means a fund from which all pension obligations are to be paid.

"Pension Reserve Fund" is a fund in the state treasury in which shall be accumulated an actuarial reserve adequate to meet present and future pension liabilities of the system.

Laws of 1947, ch. 80, § 1 (N), (O), (P), p. 549. With respect to the pension reserve fund the act further provided:

The State Treasurer, upon the certificate of the Board of Trustees, shall annually transfer from the pension reserve fund to the teachers' retirement fund that portion of the funds accumulated in the pension reserve fund which since the date of the last preceding transfer has become allocable under the actuarial tables for the payment of current pensions to all members who shall have retired.

and,

There shall be placed in the pension reserve fund all appropriations made by the legislature for the purpose of establishing and maintaining an actuarial reserve and all gifts and bequests to the pension reserve fund, and contributions of persons entering the retirement system who have established prior service credit.

Laws of 1947, ch. 80, §§ 37 and 38, p. 560, respectively. Concerning budgeting for the system, the statute stated:

At the regular July meeting next preceding a regular session of the legislature the Board of Trustees shall prepare an estimate of the total disbursements of the retirement system to be made during the next biennium, separately showing the amounts required for payment of pensions, annuities, disability allowances and expenses.

In addition the board shall compute the amount necessary to be appropriated during the next legislative session to establish and maintain an actuarial reserve adequate to meet all pension commitments of the system. These estimates must be submitted to the Governor by the secretary-manager of the retirement system for inclusion in the budget. The legislature shall make the necessary appropriations to the teachers' retirement fund and the pension reserve fund after considering the estimates as prepared and submitted and shall appropriate from the teachers' retirement fund the amounts to be expended during the next biennium.

Laws of 1947, ch. 80, § 40, p. 561.

The retirement system established by the 1947 law remained essentially unchanged until 1955, when the legislature by Laws of 1955, ch. 274, § 2, p. 1188, further subdivided the retirement fund into the annuity fund, the annuity reserve fund, the survivors' benefit fund, the pension fund, the disability reserve fund, and the expense fund. Then, in 1961, the legislature broadened the investment authority of the board of trustees somewhat, and by Senate Concurrent Resolution No. 9 directed the Legislative Council to undertake a comprehensive study of all public pension and retirement plans, and report its findings to the 38th session of the legislature in 1963.

The Legislative Council, pursuant to its directive, engaged the services of a consulting actuary and undertook the required study. This resulted in a report to the 38th session of the legislature entitled The Public Employee Pension Problem in the State of Washington, A. A. Weinberg, Consulting Actuary, which, among other things, emphasized that the liabilities of a retirement system are of a long-term nature, that investment returns were a significant funding factor, and that investment objectives should be geared to a long-term accumulation period—40 to 60 years. The report also pointed out that the reserves of a system are earmarked and intended for the benefit of the beneficiaries, and, therefore, cannot be applied to other

purposes. A. Weinberg, The Public Employee Pension Problem in the State of Washington, ch. 6, p. 127.

With the Legislative Council's report before it the legislature by Laws of 1963, Ex. Ses., ch. 14, p. 1360, further amended the 1947 retirement system statute by considerably broadening the investment powers of the board of trustees, expressly repealing Laws of 1947, ch. 80, §§ 37 and 40, pages 560 and 561, above quoted, and added the following as a new section:

*For the purpose of establishing and maintaining an actuarial reserve adequate to meet present and future pension liabilities of the system* and to pay for one-half of the operating expenses of the system, the board of trustees at each regular July meeting next preceding a regular session of the legislature shall compute the amount necessary to be appropriated during the next legislative session for transfer from the state general fund to the teachers' retirement system during the next biennium. *Such computation shall provide for amortization of unfunded pension liabilities over a period of not more than fifty years from the effective date of this 1963 amendatory act.* [July 1, 1964.] The amount thus computed as necessary shall be reported to the governor by the secretary-manager of the retirement system for inclusion in the budget. The legislature shall make the necessary appropriation from the state general fund to the teachers' retirement system after considering the estimates as prepared and submitted, and shall appropriate from the teachers' retirement fund the amount to be expended during the next biennium for operating expenses. *The transfer of funds from the state general fund to the retirement system shall be at a rate determined by the board of trustees on the basis of the latest valuation prepared by the actuary employed by the board, and shall include a percentage contribution of the total earnable compensation of the members for the biennium for which the appropriation is to be made, to be known as the "normal contribution," and an additional percentage contribution of such earnable compensation to be known as the "unfunded liability contribution." Such transfers from the general fund shall be made before the end of each calendar quarter at the rate determined by the board of trustees and shall be computed on the basis of*

*the members' total earnable compensation received for
the quarter.* The members' total contributions to the
teachers' retirement fund for each quarter shall serve as
the basis for determining the members' total earnable
compensation for the quarter. The amounts transferred
shall be distributed first to the teachers' retirement fund
for the payment of pensions, survivors' benefits and the
state's share of the operating expenses for the system,
and the balance shall be credited to the teachers' retire-
ment pension reserve fund. The total amount of such
transfers for a biennium shall not exceed the total
amount appropriated by the legislature.[1]

(Italics ours.) Laws of 1963, Ex. Ses., ch. 14, § 11, p. 1372,
now codified as RCW 41.32.401.

From this legislative background and history certain con-
sistent threads become evident. First, the retirement sys-
tem has from its inception been administered and managed
by a board of trustees with legislatively defined powers,
including the appropriate investment of excess funds; sec-
ond, to participate in the benefits of the retirement system,
members are required to systematically contribute; third,
beginning with the tentative step in Laws of 1919, ch. 150,
p. 415, and culminating in Laws of 1937, ch. 221, p. 1095;
Laws of 1939, ch. 86, p. 222, and Laws of 1941, ch. 97, p. 231,
the legislature recognized that member contributions were
not adequate to meet increasing current obligations or to

---

[1]The terms "normal contribution" and "unfunded liability contribu-
tion" are defined in the Board of Trustees' Twenty-Fifth Annual Re-
port, p. 19 (1962-1963), (Wash. Pub. Documents, vol. 3), as follows:

The annual contribution by the state consists of two parts,
namely, the normal contribution which includes the cost of survivor
benefits, and the unfunded liability contribution.

The normal contribution is the annual contribution payable by
the state to spread equally over the years of credited service of each
member the cost of his pension at retirement.

The unfunded liability contribution is the annual payment re-
quired to liquidate, over a period of 34 years, the pension liability
for all previous service which has not yet been funded. The total
unfunded liability is the amount which would be on hand if the
state's normal contribution had actually been paid into the fund
each year as service credit was established and as additional liabil-
ity developed through changes in law.

establish adequate reserves, and that supplemental funding of both aspects by legislative appropriation was necessary; fourth, with the creation of the pension reserve fund in the 1939 and 1941 enactments, the legislature affirmatively evinced a growing concern with maintaining the actuarial soundness of the retirement system with funds being appropriated not only to meet current obligations but also to establish and maintain an actuarial reserve;[2] fifth, with the report of the Legislative Council before it, the legislature by Laws of 1963, Ex. Ses., ch. 14, p. 1360, determined upon a systematic amortization of the unfunded liabilities of the retirement system and a systematic computation and funding of current and future liabilities; and sixth, that throughout the history of the retirement system the legislature has been aware of the significant factor which investment returns play in the adequate funding of a retirement program.

It is agreed between the parties that since the enactment of Laws of 1963, Ex. Ses., ch. 14, p. 1360, all appropriations and transfers as computed by the board of trustees in compliance with RCW 41.32.401 have been made and no funds have been transferred from the pension reserve fund to any other fund.

Against this background, we turn now to the actions of the Governor and the parties' contentions with respect thereto.

The Governor in revising and curtailing transfers of funds appropriated by Laws of 1969, Ex. Ses., ch. 282, p.

---

[2]The term "actuarial reserve" is explained in the Legislative Council's report to the 38th session of the legislature entitled The Public Employee Pension Problem in the State of Washington, p. 89, in the following manner:

A sound financial condition exists from the actuarial standpoint when a retirement system has assets on hand equal to the difference between (1) the total of all liabilities, both accrued and prospective, and (2) the present value of the prospective assets under the established revenue provisions of the system. This difference is known as the "actuarial reserve." Actuarial adequacy or actuarial soundness assumes that proper financial provisions have been made to meet the established benefit obligations.

2708, to the retirement system advised that he was acting pursuant to RCW 43.88.110, enacted as Laws of 1959, ch. 328, § 11, p. 1607, and amended by Laws of 1965, ch. 8, 43.88.110, p. 726, which provided, in pertinent part:

(1) Before the beginning of the fiscal period, all agencies shall submit to the governor a statement of proposed agency expenditures at such times and in such form as may be required by him. The statement of proposed expenditures shall show, among other things, the requested allotments of appropriations for the ensuing fiscal period for the agency concerned for such periods as may be determined by the budget director for the entire fiscal period. The governor shall review the requested allotments in the light of the agency's plan of work and, with the advice of the budget director, he may revise or alter agency allotments: *Provided,* That revision of allotments shall not be made for the following: Agencies headed by elective officials; University of Washington; Washington State University; Central Washington State College; Eastern Washington State College; and Western Washington State College. The aggregate of the allotments for any agency shall not exceed the total of appropriations available to the agency concerned for the fiscal period.

(2) Except for agencies headed by elective officials and for institutions for higher education, as provided in this section, the approved allotments may be revised during the course of the fiscal period in accordance with the regulations issued pursuant to this chapter. *If at any time during the fiscal period the governor shall ascertain that available revenues for the applicable period will be less than the respective appropriations, he shall revise the allotments concerned so as to prevent the making of expenditures in excess of available revenues.* To the same end, and with the exception stated in this section . . . the governor is authorized to withhold and to assign to, and to remove from, a reserve status any portion of an agency appropriation which in the governor's discretion is not needed for the allotment. No expenditures shall be made from any portion of an appropriation which has been assigned to a reserve status except as provided in this section.

(Italics ours.)

It is also urged in this respect that the Governor's action

was further authorized by Laws of 1969, Ex. Ses., ch. 282, § 6, p. 2746, the budget and appropriations act for the 1969-1971 biennium, which states, in part:

> Nothing in this section or in chapter 328, Laws of 1959, shall prevent revision of any allotment when necessary to prevent the making of expenditures under appropriations in this act in excess of available revenues.

It is agreed between the parties that at the time of the Governor's action revenues in the general fund were and would continue to be less than proposed expenditures under general fund appropriations for the remainder of the fiscal biennium.

The underlying question posed, then, is whether legislative appropriations to the retirement system are subject to the Governor's allotment control under RCW 43.88.110 and Laws of 1969, Ex. Ses., ch. 282, § 6, p. 2746.

Petitioners are representative of teachers who have retired under the retirement system and presently employed teachers and employee members of the system (prospective retirees). In essence, their contentions are two-fold: First, that the Governor's action violates, impairs or modifies the obligations of vested contractual pension rights contrary to constitutional mandates and established retirement system principles; and, second, that the repeal of Laws of 1947, ch. 80, §§ 37 and 40, pages 560 and 561, and the enactment of RCW 41.32.401, deprived the board of trustees of any statutory authority to withdraw funds from the pension reserve fund for the purpose of paying current pensions.

The respondents, except insofar as the members of the board of trustees protest, essentially contend: (1) That petitioners' vested pension rights extend only to the right to receive the pension benefits when due, and not to any particular appropriation or system of funding; (2) that, though not expressly authorized to withdraw funds from the pension reserve fund, the board of trustees has implied authority under the statutory scheme of the retirement system to withdraw such funds for the payment of current pension obligations when funds for such purposes are not

otherwise available; and (3) that, in any event, subsequent legislatures can restore to the pension reserve fund any transfers therefrom which might affect its actuarial soundness.

We believe the dispositive issue, under the circumstances of this case, revolves about the nature of petitioners' pension rights and whether or not the Governor's action under RCW 43.88.110 and Laws of 1969, Ex. Ses., ch. 282, § 6, p. 2746, impermissibly contravenes or modifies those rights.

Our state, along with other states, adheres to the "contract of employment-vested right" theory relative to public pension systems as opposed to looking upon retirement benefits as mere gratuities which may be granted at the conclusion of long and faithful service. This was succinctly pointed out in *Bakenhus v. Seattle,* 48 Wn.2d 695, 296 P.2d 536 (1956), where, pointing to decisions in California, Georgia, and Pennsylvania, we said, at pages 698, 700-02:

> In this state, a pension granted to a public employee is not a gratuity but is deferred compensation for services rendered. The contractual nature of the obligation to pay a pension when the employee has fulfilled all of the prescribed conditions was recognized in *Luellen v. Aberdeen,* 20 Wn. (2d) 594, 148 P. (2d) 849 (1944), in *Benedict v. Board of Police Pension Fund Com'rs,* 35 Wn. (2d) 465, 214 P. (2d) 171, 27 A. L. R. (2d) 992 (1950), and in *Ayers v. Tacoma,* 6 Wn. (2d) 545, 108 P. (2d) 348 (1940). Had we held in those cases, or were we to hold now, that the pension statutes provide for the payment of gratuities, we would be bound to hold further that such statutes are contrary to the provisions of Art. II, § 25, and Art. VIII, § 7, of the Washington constitution and are therefore void.
>
>     . . .
>
>     . . . The problem arises in determining the extent of the contractual undertaking on the part of the state or municipal authority which has promised the pension. There are cases which hold that, since the right to receive a pension does not arise until all the conditions are fulfilled, the employee's rights must depend upon the law as it exists at that time. This view is insupportable. Unless the services are rendered in reliance on an offer,

they are consideration for nothing, and any pension received thereafter can only be a gratuity. The promise on which the employee relies is that which is made at the time he enters employment; and the obligation of the employer is based upon this promise.

. . .

. . . Under the rule followed there, and the rule which we adopt here, the employee who accepts a job to which a pension plan is applicable contracts for a substantial pension and is entitled to receive the same when he has fulfilled the prescribed conditions. His pension rights may be modified prior to retirement, but only for the purpose of keeping the pension system flexible and maintaining its integrity. The doctrine was most recently stated in the consolidated cases of *Allen v. Long Beach* and *Alger v. Long Beach,* 45 Cal. (2d) 128, 287 P. (2d) 765 (1955), as follows:

"An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citing cases.] Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages. [Citing cases.]"

We have since consistently adhered to and followed the principles adopted in *Bakenhus. See Aldrich v. State Employees' Retirement System,* 49 Wn.2d 831, 307 P.2d 270 (1957); *Eisenbacher v. Tacoma,* 53 Wn.2d 280, 333 P.2d 642 (1958); *Letterman v. Tacoma,* 53 Wn.2d 294, 333 P.2d 650 (1958); *Dailey v. Seattle,* 54 Wn.2d 733, 344 P.2d 718 (1959); *Tembruell v. Seattle,* 64 Wn.2d 503, 392 P.2d 453 (1964); *State ex rel. Wittler v. Yelle,* 65 Wn.2d 660, 399 P.2d 319 (1965); *Vallet v. Seattle,* 77 Wn.2d 12, 459 P.2d 407 (1969).

Other states, too, have since adopted the *Bakenhus* ap-

proach, notably Arizona and Idaho in *Yeazell v. Copins,* 98 Ariz. 109, 402 P.2d 541 (1965), and *Hanson v. Idaho Falls,* 92 Idaho 512, 446 P.2d 634 (1968). In both the cited cases, the courts tangentially make reference to the employee's right to rely upon the promise of the employing agency to maintain the financial soundness of the system once that obligation is undertaken.

More directly in point, however, is the case of *Dombrowski v. Philadelphia,* 431 Pa. 199, 245 A.2d 238 (1968), wherein the Pennsylvania Supreme Court upheld the standing of the petitioner, as a city employee entitled to qualify and receive pension benefits under a municipal retirement plan containing provisions requiring an actuarially sound pension and retirement system, to seek mandamus to compel maintenance of the system on an actuarially sound footing. In addressing itself to the nature of the petitioner's injury from which his standing to maintain such an action arose, the court stated, at page 214:

> Dombrowski's complaint . . . was premised upon his belief that the city's contributions to its retirement fund were insufficient to keep it on an actuarially sound basis. As the testimony below disclosed, the present and past practices had placed the system on an actuarially unsound basis and, if continued, the unsoundness would progressively increase. In essence, then, Dombrowski was attempting to assure himself and all other members of the Philadelphia municipal retirement system that sufficient funds would be present to meet his and others' retirement payments. *Part of his contract with the city was a promise made by the city, in its Home Rule Charter, that the retirement system would be actuarially sound. The court below found, a finding not here disputed, that the city had not kept its promise. Dombrowski is thus suffering a present impairment of his contractual rights and thus an immediate injury.*

(Footnote omitted. Italics ours.)

We are satisfied that within the framework of the contract of employment-vested right theory relative to pension systems adopted by this court in *Bakenhus,* and subse-

quently steadfastly adhered to, the reasoning in *Dombrowski* is essentially sound.

We conclude, therefore, that where, as here, the legislature has over a span of years indicated a deep concern with the actuarial soundness of the retirement system, and that concern has culminated in the express adoption of a systematic method of funding to ultimately attain the desired soundness, then the principle of systematic funding so adopted becomes one of the vested contractual pension rights flowing to members of the system. This being so, it follows under *Bakenhus* that such a vested contractual right cannot be unilaterally modified except for the purpose of keeping the retirement system flexible and maintaining its integrity, which modification in turn must be reasonable and bear some material relation to the theory of a pension system and its successful operation, else the vested contractual right becomes unconstitutionally impaired.

We are convinced that the legislature, in enacting RCW 43.88.110 in 1959 and Laws of 1969, Ex. Ses., ch. 282, § 6, p. 2746, did not intend thereby to change or amend RCW 41.32.401, or to confer upon the Chief Executive of the state the power, by administrative or executive action, to modify the legislative provision of a systematic funding program studiously formulated to attain and maintain a legislatively promised financially sound teachers' retirement system. To hold otherwise would defeat the legislative purpose set forth in RCW 41.32.401 and unconstitutionally contravene and impair the petitioners' vested contractual rights to a retirement system actuarially designed through systematic funding to meet present and future pension liabilities.

It is for these reasons that the writ of mandate issued in the instant case.

With this disposition we need not and do not reach the question of whether the board of trustees is possessed of any authority to withdraw moneys from the pension reserve fund.

FINLEY, ROSELLINI, HUNTER, and HALE, JJ., concur.

NEILL, J. (dissenting)—The issue here presented is whether pension rights established by the Teachers' Retirement System include a vested right to biennial allocations to the reserve fund in the amount stated in a preliminary computation submitted to the preceding legislature by the retirement system trustees. Identification of the issue reveals much that is not involved as well as the nature of the question presented in this case.

First, this case does not, as such, involve official actions depriving the pension system of "actuarial soundness."[3] The majority announces that there is a "vested right" to such a characteristic, citing *Dombrowski v. Philadelphia,* 431 Pa. 199, 245 A.2d 238 (1968). In quoting from that case, the majority emphasizes the very points which distinguish it from the case at hand. A dispositive point in *Dombrowski* was the existence of an express provision in the Philadelphia city charter that the retirement system would be "actuarially sound," and that provision was there taken as an express contractual promise. As will be discussed, our statutes do not contain such promissory language. But my instant point is that, even assuming Washington law creates a general vested right to a pension system that is "actuarially

---

[3]"Actuarial soundness" is a term expressing the idea of building a reserve fund which, at some reasonable future time, will be sufficient to meet current obligations without new revenues. Three observations should be made as to the nature of "actuarial soundness":

1. In itself, it is a mathematical abstraction—an actuary's estimate based upon his own actuarial assumptions and subject to variance according to the "conservative" or "liberal" nature of those assumptions. A recent hypothetical illustration of this phenomenon showed actuarial estimates (of the amount needed to assure an identical fund, or degree of "actuarial soundness") ranging from $3.7 million to $19.6 million, a variance of over 500 per cent. Forbes Magazine, vol. 109, No. 6, p. 53 (March 15, 1972).

2. When "actuarial soundness" is placed in the context of fiscal management, it is revealed to be a commendable, but supplementary item, to be achieved after current necessities have been attended.

3. The prime beneficiary of "actuarial soundness" is the party who will be required to make the future payments, *not* those who will receive them. The ultimate recipients benefit in a secondary way in that payments coming due (which are in no way increased by "actuarial soundness") will have been previously funded.

sound," there is no showing in the case at bench that petitioners have been in any way deprived of that right by the Governor's exercise of his duty under the Budget and Accounting Act. RCW 43.88.110.[4] In this respect, *Dombrowski*

---

[4]For several biennia prior to 1959-61 biennium, the state was faced with continuing and increasing general fund deficits. After considerable study by the legislative budget committee, under the auspices of the executive, in consultation with a citizens committee and the work of a research firm, the legislature adopted Laws of 1959, ch. 328, which is commonly known as the Budget and Accounting Act. The preamble of said act provides (p. 1601):

SECTION 1. *Purpose.* It is the purpose of this enactment to establish an effective budget and accounting system for all activities of the state government; to prescribe the powers and duties of the governor as these relate to securing such fiscal controls as will promote effective budget administration; and to prescribe the responsibilities of agencies of the executive branch of the state government.

This legislative act includes in section 7 a definition of "appropriations" wherein it is stated:

Appropriations shall be deemed maximum authorizations to incur expenditures but the governor shall exercise all due supervision and control to ensure that expenditure rates are such that program objectives are realized within these maximums.

The heart of the control therein adopted to prevent general fund deficits is contained in section 11 which reads:

Sec. 11. *Expenditure programs; allotments; reserves.* Subsections (1) and (2) of this section set forth the expenditure programs and the allotment and reserve procedures to be followed by the executive branch.

(1) Before the beginning of the fiscal period, all agencies shall submit to the governor a statement of proposed agency expenditures at such times and in such form as may be required by him. The statement of proposed expenditures shall show, among other things, the requested allotments of appropriations for the ensuing fiscal period for the agency concerned for such periods as may be determined by the budget director for the entire fiscal period. The governor shall review the requested allotments in the light of the agency's plan of work and, with the advice of the budget director, he may revise or alter agency allotments: *Provided,* That revision of allotments shall not be made for the following: agencies headed by elective officials; University of Washington; Washington State College; Central Washington College of Education; Eastern Washington College of Education; and Western Washington College of Education. The aggregate of the allotments for any agency shall not exceed the

is distinguishable. In that case, there was a specific and undisputed finding that the city had failed to provide its promised "actuarially sound" system and that petitioner-employee was suffering immediate injury to his contract rights. The facts before us do not contain that crucial element. The most that can be inferred is that the governor's actions gave the reserve fund less actuarial strength than it otherwise would have had. This does not establish that "actuarial soundness" has been destroyed. The contrary is indicated by the fact that, even with the shift of moneys occasioned by the challenged actions, the pension reserve fund retained strength currently in excess of $177 million. I find no showing whatsoever that, in order to have an "actuarially sound" retirement system, the legislative and executive branches of this state's government must blind themselves to fiscal realities to satisfy an abstract mathematical conclusion.

Nor, in my view, is any such requirement expressed in or reasonably inferable from the legislative framework. The Teachers' Retirement System is codified as RCW 41.32. The assets of the system are broken into two broad general funds, the reserve fund aforesaid, and the retirement fund,

---

total of appropriations available to the agency concerned for the fiscal period.

(2) Except for agencies headed by elective officials and for institutions for higher education, as provided in this section, the approved allotments may be revised during the course of the fiscal period in accordance with the regulations issued pursuant to this act. *If at any time during the fiscal period the governor shall ascertain that available revenues for the applicable period will be less than the respective appropriations, he shall revise the allotments concerned so as to prevent the making of expenditures in excess of available revenues.* To the same end, and with the exception stated in this section for allotments involving agencies headed by elective officials and for institutions for higher education the governor is authorized to withhold and to assign to, and to remove from, a reserve status any portion of an agency appropriation which in the governor's discretion is not needed for the allotment. No expenditures shall be made from any portion of an appropriation which has been assigned to a reserve status except as provided in this section.

(Italics mine.)

currently of some $208 million, both of which are maintained in the state treasury. RCW 41.32.030. The reserve fund is described as "a fund in the state treasury in which shall be accumulated an actuarial reserve adequate to meet *present* and future pension liabilities of the system." (Italics mine.) RCW 41.32.010 (20).

RCW 41.32.401 provides in part as follows:

For the purpose of establishing and maintaining an actuarial reserve adequate to meet present and future pension liabilities of the system . . . the board of trustees . . . shall compute the amount necessary to be appropriated during the next legislative session for transfer from the state general fund to the teachers' retirement system during the next biennium. Such computation shall provide for amortization of unfunded pension liabilities over a period of not more than fifty years from July 1, 1964. The amount thus computed as necessary shall be reported to the governor . . . for inclusion in the budget. The legislature shall make the necessary appropriation from the state general fund . . . after considering the estimates as prepared and submitted, and shall appropriate from the teachers' retirement fund the amount to be expended during the next biennium for operating expenses. The transfer of funds from the state general fund to the retirement system shall be at a rate determined by the board of trustees on the basis of the latest valuation prepared by the actuary employed by the board, and shall include [percentage contributions] . . . Such transfers from the general fund shall be made before the end of each calendar quarter at the rate determined by the board of trustees and shall be computed on the basis of the members' total earnable compensation received for the quarter . . . The amounts transferred shall be distributed first to the teachers' retirement fund for the payment of pensions, survivors' benefits and the state's share of the operating expenses for the system, and the balance shall be credited to the teachers' retirement pension reserve fund. The total amount of such transfers for a biennium shall not exceed the total amount appropriated by the legislature.

The majority notes that teachers' pension rights in this state are regarded as deferred compensation and contrac-

tual in nature. With this I agree. But this in no way alters the fact that the extent of those rights is measured exclusively by the statutes creating them. *State ex rel. Wittler v. Yelle*, 65 Wn.2d 660, 399 P.2d 319 (1965).

I see nothing in the legislation establishing the teachers' retirement system that supports the notion that neither the legislature nor the Governor can alter the computation submitted each biennium by the board's actuary. To the contrary, the terms of RCW 41.32.401 rather clearly leave it with the legislature to determine what is a "necessary appropriation . . . after considering the estimates as prepared and submitted." Such a reading is indicated not only by the terms of the statute, but by common sense. Actuarial conclusions need consider only mathematical factors and estimates. The legislature must cope with additional considerations and realities, such as the availability of funds, and balance the necessity of meeting current obligations (including current pension payments) with the desirability of placing moneys in a reserve fund for future use.[5]

RCW 41.32.401 does not require transfers of funds in blind adherence to the first computed estimates. To the contrary, the statute injects considerable flexibility in calling for transfers of a percentage rather than a set amount, and tying the amount of the transfer to the "latest valuation" made in each "calendar quarter." The rate of transfer is to be determined by the board of trustees. The legislative appropriation, but for a specific allocation for operating expenses, is made in general terms to the retirement system as a whole. This, again, indicates a flexible rather than a static approach. The statute does not call for a specific amount to be credited to the reserve fund. Rather, it decrees that the balance after all distributions for retirement fund purposes is the amount to be credited to the reserve

[5]It is of interest to note that by the terms of RCW 41.32.4941 the legislature did transfer funds from the Pension Reserve Fund to the Teachers' Retirement Fund for the purpose of paying increased benefits (1961). Laws of 1961, Ex. Ses., ch. 22, § 4.

fund. The statutory limitation on funding is also in general terms, requiring only that the total amount of such transfers in a biennium shall not exceed the total amount appropriated by the legislature.

The appropriation which is the subject of this lawsuit has two important characteristics. First the appropriation states the general total sum appropriated to the retirement system as a whole, which is in consonance with the statutory scheme discussed above. Second, the appropriation to the teachers' retirement system was *expressly* made subject to the Governor's revisory powers. Laws of 1969, Ex. Ses., ch. 282, § 6, p. 2746. The majority, in citing this section, has failed to note the important fact that the specific legislative appropriation here involved is, by its very terms, made subject to the Governor's allotment control under RCW 43.88.110.[6] Thus, this case involves no conflict between the powers of the legislature and the executive; those branches of government have acted in consonance in this matter.

In today's decision, the majority ignores the basic nature of "actuarial soundness" and the need to deal with it in the context of fiscal management. Without considering the interests of the prime beneficiaries of "actuarial soundness" (the taxpayers), the majority elevates the interest of secondary beneficiaries to that of a "vested right." Such elevation might be tenable as a "contractual" matter *if* there were an express or at least reasonably inferable promise to that effect by the state—such as existed in *Dombrowski, supra.* But none is to be found here, absent the most strained and imaginative interpretation.

It is to be emphasized that this case does *not* involve the firmly established right of public employees to receive pension payments as they come due. That vested pension right,

---

[6] It is pertinent to note that the legislature has not seen fit to include the Teachers' Retirement System among those agencies expressly exempted from this power of the executive to revise allotments. *See* RCW 43.88.110(1). No issue is here raised by the parties or the record as to whether the Governor has the power to selectively revise allotments or must instead exercise his revisory power pro rata among all nonexempt agencies.

expressed in the line of cases represented by *Bakenhus v. Seattle,* 48 Wn.2d 695, 296 P.2d 536 (1956), imposes upon the state or municipal authority which has promised the pension "the obligation to pay a pension when the employee has fulfilled all of the prescribed conditions." *Bakenhus, supra* at 698. This solemn contractual obligation is supported by the full faith and credit of the state.

In the case at bench that obligation is being fully met and petitioners make no substantial claims that it will not continue to be met. To conclude that the establishment and mandatory biennial implementation of the statutory goal of this reserve account is essential to protect the rights of teachers to receive their pensions as they become payable requires the assumptions that the full faith and credit of this state will be insufficient to pay teachers' pensions or that the government will renege upon its solemn contractual obligations and that the judiciary is powerless to otherwise protect the rights of teachers to receive the pensions due. In my view, such assumptions are highly unrealistic and should not be indulged in a case involving the sovereign state—as distinguished from local governing units, which have substantial restrictions on the extent of their taxing authority. Indeed this court has embraced the opposite assumptions. To illustrate, the assumption that the legislature will meet obligations when called upon to do so underlies our rule that once the state wrongfully "takes" private land it will not be ousted and the property owner will be left to his damages remedy. *See Wandermere Corp. v. State,* 79 Wn.2d 688, 697, 488 P.2d 1088 (1971); *State ex rel. Decker v. Yelle,* 191 Wash. 397, 71 P.2d 379 (1937); *State ex rel. Peel v. Clausen,* 94 Wash. 166, 162 P. 1 (1917).

Prudent fiscal management of state affairs is a responsibility which the constitution places in the legislative and executive branches of government, not in this court. To construe the pension legislation as creating a vested right in the method of funding the state's obligation would require this court to find a legislative intent to surrender for the future a substantial portion of its fiscal responsibilities

in the operation of state government. As I have previously discussed, I find nothing in this legislation conveying such intent. Moreover, it seems to me that ascribing such meaning to the legislation subjects it to constitutional doubt. *See State ex rel. Washington State Bldg. Financing Authority v. Yelle*, 47 Wn.2d 705, 289 P.2d 355 (1955). It is to be observed that this court has heretofore characterized the 50-year amortization provision as a mere "admonition by the legislature to future sessions" in upholding that provision against a claim that it violates the "debt" provision of Const. art. 8. *State ex rel. Wittler v. Yelle*, 65 Wn.2d 660, 668-69, 399 P.2d 319 (1965).

For these reasons I think it more proper to view RCW 41.32 as a legislative expression of a fiscally prudent program of building up over a period of 50 years a fund which will relieve then current taxpayers of a portion of the preexisting obligations of the state to meet pension payments. The statute is just the "admonition" expressed in *Wittler, supra,* rather than the absolute command to future legislatures contended for by petitioners. Government is not entirely unlike the individual who, during times of current ability places funds in a savings account to tide him over periods of economic stress. When his current income is insufficient to meet maturing mortgage payments and other such obligations, he draws on that savings account which, in turn, will be replenished when current income exceeds current needs. That analogy accords with common sense and with the constitutional and legislative framework before this court.

I am reluctant to conclude that governmental decision making is to be removed from the legislature, whose members are elected by, representative of, and accountable to the body politic, and reposed instead in persons or groups which do not bear these characteristics. In my view that, and only that, is accomplished by today's majority decision. Its result adds not a penny to pensions being received or to be received, does not protect the moneys contributed by

teachers (which are placed in separate accounts)[7] and has not been shown necessary to assure "actuarial soundness" of the pension system. None of these matters are involved. Rather, the majority, in the name of "vested right," establishes a prior claim to state funds, immune from the exercise by the legislature and the executive of their constitutional and statutory duties.

Thus, being convinced that the exercise of the allotment control is not an impairment of a teacher's right to pension benefits as they become payable, and finding no legislative commitment binding future legislatures, I would deny the writ.

STAFFORD, J. (concurring specially in the dissent)—I have carefully reviewed both the majority and dissenting opinions and find that I cannot fully agree with either.

I do not agree with the dissent's assertion that actuarial soundness, or its equivalent, is assured by the fact that members of the pension system have a vested right to receive payments as they become due. That position is based upon an assumption that the system's strength is assured by the state's credit. Such credit is said to be unassailable because of the state's unlimited power to collect all taxes necessary to pay its obligations.

The argument is good in theory, however, it does not bear up under historical scrutiny. The great depression of the 1930's made it painfully clear that the power to levy taxes is of little value if people have no money with which to pay them. For example, taxing authorities cannot always recover money for unpaid taxes by the simple process of selling the property of defaulting taxpayers. Property can be sold only if there are purchasers with money. In addition, if people have no money, they will defer or eliminate the purchase of many items subject to state sales tax. In short, history tells us that the credit of state govern-

---

[7]Upon retirement a teacher receives retirement benefits consisting of two parts. He receives an annuity derived from his own contributions to the annuity fund. He also receives a pension which comes from the state's allocations to the retirement system.

ment rests upon a much more tenuous base than one may care to admit.

It is no answer to say that pension payments may be made by warrant, if there are insufficient funds. Turning again to the great depression, one is reminded that many banks refused to cash warrants and others did so only after discounting them. Thus, those paid by warrant were faced either with an inability to cash them, or with the necessity of accepting less than the warrant's face value.

Further, the Budget and Accounting Act, Laws of 1959, ch. 328, as amended by Laws of 1965, ch. 8, does not give a Governor unlimited power to revise or withhold previously approved allotments from agencies not exempted in sections 11 and 24 of the act. Section 11 imposes two limitations: (1) the Governor must first "ascertain that available revenues for the applicable period will be less than the respective appropriations"; and, (2) "he shall revise the *allotments* concerned so as to prevent the making of expenditures in excess of available revenues." (Italics mine.)

All parties agree that at the time here in question revenues in the general fund were, and would continue to be, less than proposed expenditures for the remainder of the fiscal biennium. Thus, the requirement of the first limitation has been met.

It will be noted, however, that the second requirement refers to the revision of "allotments". Use of the plural indicates that the total budget may not be balanced at the expense of one or a few departments or agencies. If the power is exercised, "allotments" must be revised or withheld pro rata among *all* nonexempt agencies and departments, rather than by being revised or withheld selectively.

Granted, petitioners do not contend that the allotment in question was singled out. Nevertheless, for the sake of accuracy, we should not leave an impression that the power under section 11 is unbridled.

Finally, I disagree with the dissent's position that the Laws of 1963, Ex. Ses., ch. 14 do not necessarily contemplate a pension system that is actuarially sound. While it is

true the words "actuarially sound" do not appear in the Laws of 1963, Ex. Ses., ch. 14, it is mere quibbling to say that the language contained therein, at page 1372, does not contemplate the creation of a pension system that eventually will be "actuarially sound":

*For the purpose of establishing and maintaining an actuarial reserve adequate to meet present and future pension liabilities of the system* and to pay for one-half of the operating expenses of the system, *the board of trustees* at each regular July meeting next preceding a regular session of the legislature *shall compute the amount necessary to be appropriated* during the next legislative session for transfer *from the state general fund to the teachers' retirement system during the next biennium. Such computation shall provide for amortization of unfunded pension liabilities over a period of not more than fifty years from the effective date of this 1963 amendatory act.*

(Italics mine.)

Turning now to the majority opinion, it is one thing to say that the legislature created a pension system which contemplates eventual "actuarial soundness". It is quite another to accept the majority's position that a member of the system possesses a vested right therein and also has a vested right which deprives the legislature of monetary power to do other than systematically appropriate all funds a trustee estimates as necessary to reach "actuarial soundness" within a specified time.

Members of the system have a vested right in an "actuarially sound" system. However, the extent thereof as well as the extent of legislative and/or executive control of funds appropriated to meet the estimated need are derived from the Laws of 1963, Ex. Ses., ch. 14, § 11, p. 1372. Thus, the language that created the system is important.

In addition to providing for eventual "actuarial soundness", the above mentioned act also provides:

The legislature shall make the *necessary appropriation* from the state general fund to the teachers' retirement system *after considering the estimates* as prepared and *submitted,* and shall appropriate from the teachers' re-

tirement fund the amount to be expended during the next biennium for operating expenses.

(Italics mine.) Pursuant thereto the board of trustees is required to make a computation that is a mere *estimate* of needs. The legislature, in turn, is required to "consider" the estimate. However, the act neither requires the legislature to follow the estimate nor provides that the board's estimate is a gauge of what is deemed to be a "necessary appropriation" in any one biennium. Thus, one must conclude that the vested rights created by the above cited act are subject to the legislature's determination of what is deemed to be a "necessary appropriation."

With such ultimate legislative control in mind, it will be remembered that the appropriation for the 1969 biennium contained a limitation upon what it deemed to be a "necessary appropriation":

In order to carry out the provisions of these appropriations and the state budget, the budget director, with the approval of the governor, may:

(1) Allot all or any portion of the funds herein appropriated or included in the state budget, to the various agencies by such periods as he shall determine *and may place any funds not so allotted in reserve available for subsequent allotment:* . . .

(Italics mine.) Laws of 1969, Ex. Ses., ch. 282, § 6, p. 2746.

The legislature not only acted within the power reserved to itself in the Laws of 1963, Ex. Ses., ch. 14, § 11, but acted within the purview of the Budget and Accounting Act[8] which contains language of similar import. Further, the appropriation act also authorized a withholding of funds with the approval of the Governor, under conditions similar to those provided in the Budget and Accounting Act.

The majority seems to assume that the pension system created by Laws of 1963, Ex. Ses., ch. 14, is not subject to section 11 of the Budget and Accounting Act. However, such assumption ignores the fact that the Budget and Accounting Act, adopted in 1959, specifically exempted nu-

---

[8]Laws of 1959, ch. 328, as amended by Laws of 1965, ch. 8.

merous agencies, departments, and commissions from its controls.[9] The teachers' pension system, however, was not exempted. Furthermore, the legislature could have provided for such an exemption when the pension system was created in 1963, but it did not do so.

Thus, in 1963, when the legislature enacted the "actuarially sound" pension system, it created a system subject to the previously enacted fiscal controls of the Budget and Accounting Act. That this was not mere happenstance is demonstrated by the legislative use of such control in the appropriation of funds for the 1969 biennium (*i.e.*, authorizing the withholding of funds subject to approval of the Governor, in a manner similar to that provided in the Budget and Accounting Act). In short, the Governor was authorized to act either under the specific language of the legislative appropriation or of the Budget and Accounting Act.

In passing, an additional defect in the majority's position should be noted. The record contains no evidence that either the legislature's 1969 appropriation or the Governor's withholding of funds pursuant thereto, impaired the actual or eventual "actuarial soundness" of the pension system.

In the final analysis, there is no question that members of the pension system have a vested right in a system that eventually will be actuarially sound. However, this vested right is subject to the power of the legislature to determine the amount of funding needed, in any one biennium, to reach the actuarial goal. Further, the system is subject to the fiscal control of the Budget and Accounting Act.

I am in complete sympathy with the need for an actuarially sound pension system. It is a matter of good business practice and prudent fiscal management to so provide. Nevertheless, the method of achieving that goal is a legislative rather than a judicial function. The legislature has the power to provide for an actuarially sound system free of the Budget and Accounting Act's control. If it does so, then,

[9]Laws of 1959, ch. 328, §§ 11 and 24.

492

under the theory of *Dombrowski v. Philadelphia*, 431 Pa. 199, 245 A.2d 238 (1968), the legislature will be required to provide systematic funding to insure an actuarially sound pension system. Unfortunately, the legislature has not taken that step to date.

Without question each member of the court is in sympathy with the cause of those who are members of the teachers' pension system. Nevertheless our personal feeling in this regard provides us with no authority to override both legislative and executive power by judicial fiat. For these reasons, I am compelled to dissent.

WRIGHT, J., concurs with STAFFORD, J.

Petition for rehearing denied June 23, 1972.