[Civ. No. 23229. Third Dist. May 7, 1984.]

CALIFORNIA TEACHERS ASSOCIATION et al., Petitioners, v.
KENNETH CORY, as State Controller, Respondent;
TEACHERS' RETIREMENT BOARD OF THE STATE TEACHERS'
RETIREMENT ASSOCIATION et al., Real Parties in Interest;
GEORGE DEUKMEJIAN, as Governor, etc., et al., Interveners.

TEACHERS' RETIREMENT BOARD OF THE STATE TEACHERS'
RETIREMENT ASSOCIATION et al., Petitioners, v.
KENNETH CORY, as State Controller, Respondent;
CALIFORNIA TEACHERS ASSOCIATION et al.,
Real Parties in Interest;
GEORGE DEUKMEJIAN, as Governor, etc., et al., Interveners.

## COUNSEL

Schwartz, Steinsapir, Dohrmann, Krepack, Sommers & Edelstein, Schwartz, Steinsapir, Dohrmann & Sommers, Laurence D. Steinsapir, Michael R. Feinberg, Raymond L. Hansen, Bullen, McKone, McKinley, Gay, Keitges & Pach, Donald M. Pach, James R. Donahue and Keith Tohru Yamanaka for Petitioners and Real Parties in Interest.

Morrison & Foerster, F. Bruce Dodge and Patrick J. Flinn for Respondent.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, and Geoffrey L. Graybill, Deputy Attorney General, for Interveners.

## OPINION

**BLEASE, J.**—In this consolidated original mandamus proceeding the petitioners seek to compel the State's Controller to transfer funds from the General Fund (Gov. Code, § 16300) to the Teachers' Retirement Fund (Ed.

Code, § 22300).[1] The funds are amounts allegedly owing as state contributions to the State Teachers' Retirement System (§ 22001 et seq.). Petitioners are the California Teachers Association (CTA), three officers of CTA who are public school teachers, the Teachers' Retirement Board (§ 22200), and various members of the board. Petitioners contend the transfer is compelled by the continuing appropriation statutes in the Education Code, section 23401 et seq., notwithstanding the appropriations for payments of lesser amounts in annual budget bills enacted subsequently. Petitioners argue that giving the subsequent (in lieu) appropriations amendatory effect would unconstitutionally impair a contract.

Respondent Kenneth Cory, Controller, demurs to the petitions. He admits that the most recent annual budget bill appropriating $1 is a prohibited impairment. However, he submits three earlier instances of reduced but substantial in lieu appropriations may not have been. The Controller contends, in any event, he cannot effect any transfer unless compelled by order of court.

Interveners George Deukmejian, Governor, and the Department of Finance (Gov. Code, § 13000) [represented by the Attorney General] demur to the petitions and answer them denying various assertions. These interveners (collectively hereafter the Governor) deny that the continuing appropriation statutes in the Education Code confer contract rights and, accordingly, deny that petitioners are entitled to any relief. The Governor also contends that no valid appropriation exists upon which an order to transfer may be founded. We have concluded petitioners' claim has merit and will issue a peremptory writ commanding transfer of funds.

### FACTS[2]

The Legislature has enacted a statewide teachers' pension plan. The purpose clause recites: "In order to provide a financially sound plan for the retirement, with adequate retirement allowances, of teachers in the public schools of this state, teachers in schools supported by this state, and other persons employed in connection with the schools, the State Teachers' Retirement System is established." (§ 22001) With limited exceptions, partic-

---

[1]Nondescript statutory references are to the Education Code.

[2]The material facts are gleaned from the statutory record of the system and the concession of all parties that the system has always had a significant unfunded liability. (Compare *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 82-83 [112 Cal.Rptr. 777, 520 P.2d 1].) The Controller in his briefs and the Governor at the hearing on this matter have suggested that an issue of fact precludes summary appellate resolution of some or all of the claims tendered herein. (See generally, Cal. Civil Writs (Cont.Ed.Bar 1970) § 17.11.) The premise for this suggestion is that the degree of impairment is a material issue of fact raised by the pleadings. As explained, *infra*, in section IV of this opinion, that is not the case.

ipation in the system is mandatory for teachers, librarians and other certificated employees (hereafter collectively teachers) of the elementary and secondary schools (including community colleges) of the state. (§§ 22500 et seq.; 50 et seq.) Upon death, or retirement for service or disability the system is obligated to pay various sums to the teacher or beneficiaries of the teacher. (§§ 23800 et seq.; 23900.)

The progenitor of the current State Teachers' Retirement System was established in 1913. (Stats. 1913, ch. 694, p. 1423.) From its inception the system has had an unfunded liability; the statutory scheme has never included a mechanism for compiling reserves actuarially sufficient to generate investment income proportionate to the amount of future benefit payments for which it becomes obligated. In 1971 the Legislature acknowledged that the assets of the system were insufficient to meet this unfunded liability. (Stats. 1971, ch. 1305, p. 2568.) In light of this situation, the Legislature provided that members and the employing agencies each shall contribute to the system a percentage of salaries earned and that the state shall contribute a sum certain for a given number of years. (*Ibid.*)

The state contribution was set at $135 million annually for a period of 30 years beginning July 1, 1972. (*Id.,* at p. 2577.) By virtue of an existing statute, former section 14113, these sums did not constitute an appropriation. Rather, the appropriation was made in and was subject to each State Budget Act.[3] (Stats. 1969, ch. 896, § 2, p. 1771.) Over time the amount of the aggregate statutory contribution was raised to $144.3 million in order to defray intervening increases in benefits. (See Stats. 1977, ch. 894, §§ 9, 10, pp. 2678-2679; Stats. 1979, ch. 259, item 343, p. 700.)

On June 6, 1978, Proposition 13 (Cal. Const., art. XIII A) was enacted by the electorate. It reduced the revenues for public school financing available from local property taxes. (See Comment, *The Right to a Meaningful Education in California: Should Dollars Make the Difference?* (1979) 10 Pacific L.J. 991, 1008-1010.) It necessitated a far-reaching restructuring of the fiscal basis of local government, including public education. The Legislature responded with chapter 282, Statutes of 1979, which included a modification of the scheme of state contributions to the Teachers' Retirement Fund. The prior contribution provisions were repealed and present

---

[3]Former section 14113 provided: "The provisions of this chapter providing for state contributions do not constitute appropriations of money from the State Treasury. The sums required for state contributions shall be appropriated in each State Budget Act, or in such other manner as the Legislature may deem appropriate." This section became section 23403 of the Reorganized Education Code of 1976. (Stats. 1976, ch. 1010, p. 2960.) It was repealed by Statutes of 1979, chapter 282, section 10, page 975.

sections 23401, 23402, and 23403 were enacted, which appropriated amounts increasing annually according to statutory formulae. The State Controller was mandated to "transfer, in equal monthly payments, from the General Fund to the Teachers' Retirement Fund, the amounts specified in sections 23401 and 23402."[4] (Stats. 1979, ch. 282, §§ 10 and 11, pp. 975-976.) The existing law, which required that the appropriations come from the State Budget Act, was repealed. (See fn. 3, *ante.*)

The first transfers to the Teachers' Retirement Fund were to be made for the fiscal year beginning July 1, 1980. (*Ibid.*) However, the State Budget Act for that fiscal year contained an appropriation, *in lieu* of the statutory appropriation, of a reduced amount, $171,616,000. The act said of this amount: "For transfer by State Controller, in lieu of the appropriations

---

[4]The text of the enactment is: "SEC. 10. Chapter 15 (commencing with Section 23400) of Part 13 of the Education Code is repealed. [¶] SEC. 11. Chapter 15 (commencing with Section 23400) is added to Part 13 of the Education Code, to read: [¶] CHAPTER 15. PUBLIC CONTRIBUTIONS [¶] 23400. The school districts and other agencies employing members of the State Teachers' Retirement System shall contribute monthly to the Teachers' Retirement Fund 8 percent of the total of the salaries upon which members' contributions are based. [¶] 23401. There is hereby appropriated each fiscal year from the General Fund to the State Teachers' Retirement Fund, beginning July 1, 1980, the sum of one hundred forty-four million three hundred thousand dollars ($144,300,000) cumulatively increased or decreased beginning July 1, 1980, by an amount which reflects the change in the California Consumer Price Index in the preceding fiscal year. This index is defined as the average of the composite annual Consumer Price Indexes for the Los Angeles-Long Beach area and the San Francisco-Oakland area, published by the Bureau of Labor Statistics of the United States Department of Labor. [¶] 23402. In addition to the appropriation provided by Section 23401, there is hereby appropriated annually from the General Fund to the Teachers' Retirement Fund, the amounts specified below:

| | "(Millions) |
|---|---|
| "(a) For the fiscal year ending June 30, 1981 | $ 10 |
| "(b) For the fiscal year ending June 30, 1982 | 20 |
| "(c) For the fiscal year ending June 30, 1983 | 40 |
| "(d) For the fiscal year ending June 30, 1984 | 60 |
| "(e) For the fiscal year ending June 30, 1985 | 80 |
| "(f) For the fiscal year ending June 30, 1986 | 100 |
| "(g) For the fiscal year ending June 30, 1987 | 120 |
| "(h) For the fiscal year ending June 30, 1988 | 140 |
| "(i) For the fiscal year ending June 30, 1989 | 160 |
| "(j) For the fiscal year ending June 30, 1990 | 180 |
| "(k) For the fiscal year ending June 30, 1991 | 200 |
| "(l) For the fiscal year ending June 30, 1992 | 220 |
| "(m) For the fiscal year ending June 30, 1993 | 240 |
| "(n) For the fiscal year ending June 30, 1994 | 260 |
| "(o) For the fiscal year ending June 30, 1995 | 280 |

"For the fiscal year 1994-95 and each fiscal year thereafter, the amount appropriated pursuant to (o) above, shall be increased or decreased by an amount which reflects the change in the preceding fiscal year in the California Consumer Price Index as defined by Section 23401. [¶] 24303. The State Controller shall transfer, in equal monthly payments, from the General Fund to the Teachers' Retirement Fund, the amounts specified in Sections 23401 and 23402."

provided for in Sections 23401 and 23402 of the Education Code . . . ." (Stats. 1980, ch. 510, p. 1207.)

Similarly, in lieu reduced appropriations were enacted in the next two State Budget Acts. (Stats. 1981, ch. 99, p. 510; Stats 1982, ch. 326.) In the succeeding budget bill, for fiscal year 1983-1984, the Legislature appropriated and sent to the Governor an in lieu amount of $211,313,000. (Stats. 1983, ch. 324 [item 6300-101-001].) On this occasion, for the first time, the Governor reduced the in lieu appropriation, to one dollar ($1), saying the money could better be used for other educational purposes notwithstanding there was an unfunded actuarial liability of the Teachers' Retirement System.[5] (*Id.*, p. 45.)

These proceedings ensued shortly thereafter.

## DISCUSSION

It is at once apparent that this case is a close relative of our recent decision in *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773 [189 Cal.Rptr. 212]. In *Valdes* we reviewed an enactment repealing, for three months, the statutory appropriation of state employer contributions to the Public Employees' Retirement System provided by Government Code section 20741 et seq. We held the enactment unconstitutional as an impairment of contract.[6] (*Valdes, supra.*) None of the parties argues *Valdes* was wrongly decided or ill-reasoned and it serves as a substantial predicate for our discussion here.

## I

▮▮▮ The Governor tenders the broadest defenses to petitioners' claims. He argues that section 23401 et seq. do not give rise to a contract and,

---

[5]Accompanying this reduction action was the following explanation: "Item 6300-101-001—For transfer to the State Teachers' Retirement Fund. I reduce this item from $211,313,000 to $1. [¶] This appropriation is an annual General Fund subsidy towards the unfunded actuarial liability of the Teachers' Retirement System. Withholding this subsidy for one year will have no effect on retirement allowance payments to retirees. However, this amount can have an immediate and significant impact in other areas of education. It is because of those more pressing needs that I propose to temporarily suspend this transfer. I encourage the Legislature to act to repay this transfer in the future, or to enact legislation increasing the income producing potential of the Teachers' Retirement System such as through the sale or use of surplus school lands."

We were informed by the Attorney General at the hearing on this matter that the Governor's proposed budget for this year includes a proposed allotment to restore the amount of the reduction.

[6]The texts of the constitutional prohibitions of impairment of contract in pertinent parts are:

"No State shall . . . pass any . . . law impairing the obligation of contracts . . . ." (U.S. Const., art. I, § 10.)

"A . . . law impairing the obligation of contracts may not be passed." (Cal. Const., art. I, § 9.)

accordingly, the sums provided for in those sections may be modified at will by the State Budget Acts. He says that statutory contracts can only be established by an explicit statement in the statute that private rights in contract are created. The issue is formation of a contract to which the state is a party, i.e., what is the measure by which a statute manifests a promise which, when accepted, creates a contract. That is an issue of state contract law to which we turn.[7]

The parties agree that a state may enter into contracts with citizens creating an obligation which the Legislature cannot impair by subsequent enactment. They agree that legislation which merely declares a state policy and directs a subordinate body to carry it into effect is subject to revision or repeal in the discretion of the Legislature.

■ The Governor takes the position that a statute does not create contractual obligations unless it explicitly uses words of contract and that a contract therefore cannot be created by implication from a statute. He takes as his text an excerpt which *Taylor* v. *Board of Education* (1939) 31 Cal.App.2d 734, 742 [89 P.2d 148], obtained from the legal encyclopedia, American Jurisprudence. It says that "[a]n agreement requiring the . . . suspension of legislative control will not be raised by mere implication."[8] Whatever the meaning of this generality borrowed from foreign law,[9] three

---

[7]Legislatures, unlike private persons, have the power to create "obligations" which are not contractual in nature. (See Civ. Code, § 1428.) To distinguish them, we must determine whether the statute is "intended" to create private rights of a contractual nature. (See, e.g., *Dodge* v. *Board of Education* (1937) 302 U.S. 74, 78-79 [82 L.Ed. 57, 61-62, 58 S.Ct. 98]; 16A Am.Jur.2d § 691.) This is a matter of state law. (Compare *Dodge, supra,* with *Indiana* ex rel. *Anderson* v. *Brand* (1938) 303 U.S. 95 [82 L.Ed. 685 [58 S.Ct. 443, 113 A.L.R. 1482]].)

[8]The full excerpt says: "*Under well recognized principles of law, a legislative act which would, if construed to be a contract, limit or extinguish the power of the government completely to control the subject matter of the enactment, will not be so construed unless the legislative intention to create a contract clearly appears, and all doubts must be resolved in favor of the continuance of the power of the government. An agreement requiring the surrender or suspension of legislative control will not be raised by mere implication.* (12 Am.Jur. 39.)" In American Jurisprudence the statement is made in the narrow context of the duration of a legislatively conferred franchise. (12 Am.Jur., pp. 39-40.) The supporting authorities, omitted in translation, plainly address doctrinal issues of contract interpretation rather than contract formation. (See e.g. *Newton* v. *Mahoning County* (1880) 100 U.S. 548, 561 [25 L.Ed. 710, 712] "But conceding for purposes of this opinion, that there is here a contract, as claimed by the plaintiff in error, then the question arises: what is the contract?".)

[9]The facts in *Taylor* have nothing to do with implication. *Taylor* addressed the question whether the teacher tenure statutes contained a promise that the state would never modify them. As we noted in *California Medical Assn.* v. *Lackner, supra,* 117 Cal.App.3d at page 559, footnote 8, the tenure statutes at issue in *Taylor* contained an explicit statutory statement disavowing any such promise. They expressly subordinated tenure in employment rights "to the right of the Legislature to amend or repeal [them] . . . ." *Taylor, supra,* 31 Cal.App.2d at p. 742.) That is not the case here. The statute subordinating the State Teachers Retirement System appropriations to the State Budget Act (see *ante,* fn. 3) was repealed.

quarters of a century of cases, from *County of San Luis Obispo* v. *Gage* (1903) 139 Cal. 398 [73 P. 174] to our recent decisions in *California Medical Assn.* v. *Lackner* (1981) 117 Cal.App.3d 552 [172 Cal.Rptr. 815] and *Valdes, supra,* 139 Cal.App.3d 773, have *implied* contractual obligations from the particular texts and contexts of the statutes at issue. Once an implied contract of the state is demonstrated it is of equal dignity with an express contract for purposes of the prohibitions against impairment. (See, e.g. *Gilman* v. *Sheboygan* (1863) 67 U.S. 510, 513 [17 L.Ed. 305, 307]; *Mississippi Use of Robertson* v. *Miller* (1928) 276 U.S. 174, 179 [72 L.Ed. 517, 520, 48 S.Ct. 266], "[A]fter services have been rendered by a public officer under a law, specifying his compensation, there arises an implied contract under which he is entitled to have the amount so fixed. And the constitutional protection extends to such contracts just as it does to those specifically expressed"; cf. *Floyd* v. *Blanding* (1879) 54 Cal. 41, 46-47.)

In California law, a legislative intent to grant contractual rights can be implied from a statute if it contains an unambiguous element of exchange of consideration by a private party for consideration offered by the state. The paradigmatic exposition of this theory is in *County of San Luis Obispo* v. *Gage, supra,* 139 Cal. 398, 407-408. *Gage* held that the statutory obligation of the state to fund the support of orphan and abandoned children provided by the counties "was the equivalent of an offer upon condition, and upon the performance of the condition by any county the offer became a promise, and binding as such upon the state." (*Id.,* at p. 407.)[10]

■■■ That is the case here. The subject of the legislation, pension rights, has long been characterized as within the domain of contract. (See *Allen* v.

---

[10]*Gage* said: "Aside from the authorities on the subject, it must be conceded upon principle that the obligation here in controversy is an obligation arising upon a contract. The state by the act of 1880, in effect promised to each county in the state that if it should thereafter maintain and support persons of a class mentioned in the act, the state would appropriate and pay to such county the sums of money therein stated. This was the equivalent of an offer upon condition, and upon the performance of the condition by any county the offer became a promise, and binding as such upon the state. There was before 1893 a limitation upon the binding force of such a contract, when so consummated, in this, that, as the state could not be sued, the law furnished no remedy for the failure or refusal to pay; but that limitation does not detract in the least from the effect of the whole transaction as establishing a contractual relation. . . . [Citation omitted.] It may be conceded that there may be other obligations arising by operation of law which do not also come within the class of obligations arising from contract; but it must also be admitted that there are obligations which, in a certain sense, arise from the operation of law, and at the same time are in substance and effect contracts. The obligation here in question comes within this latter class. It arises from the operation of the act of 1880. The act itself, coupled with the subsequent performance of the conditions by the respondent, furnishes all the elements which are necessary to the formation and existence of an implied contract. It must therefore be concluded that the claim of the respondent against the state is a claim on contract within the meaning of the act of 1893, which allows persons having such claims to maintain a suit thereon against the state."

*Board of Administration* (1983) 34 Cal.3d 114, 121 [192 Cal.Rptr. 762, 665 P.2d 534], and cases cited therein.) A statute offering pension rights in return for employee services expresses an element of exchange and thereby implies these rights will be private rights in the nature of contract. ■ "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment." (*Betts* v. *Board of Administration* (1978) 21 Cal.3d 859, 863 [148 Cal.Rptr. 158, 582 P.2d 614].) Pension rights can encompass the funding mechanism for the pension when there is a palpable element of exchange involving funding; continued service as a teacher in return for enhanced assurance that funds to pay the pension benefits will be available at retirement. We held in *Valdes,* given its statutory context, that a right to reserve funding of the state retirement system is a contractual pension right within the ambit of the contract clause. (*Valdes, supra,* 139 Cal.App.3d 773; also see e.g. *Weaver* v. *Evans* (1972) 80 Wn.2d 461 [495 P.2d 639, 649-650] for a direct parallel to this case.) In *Valdes,* we found an indicium of contractual intent in the legislative declaration that the funding obligation was a continuing obligation of the state. (*Id.,* at pp. 781-782.) From this and the historical significance of the obligation we implied a contractual obligation.

■ These principles apply to sections 23401 and 23402. Their language manifests a continuing obligation to fund the Teachers' Retirement Fund in future years pursuant to statutory formulae. (Cf. *Valdes, supra,* at p. 787.) In the enactment creating the obligation the provisions of law conditioning the funding upon appropriations in the State Budget Act were repealed. (See, e.g., Stats. 1977, ch. 894, § 85, p. 2737.) By these means a commitment to permanency of funding was made. Given this commitment to permanency of funding and the critical importance which funding bears to the capacity of the state to fulfill the underlying contractual promise to pay the pensions, we imply a promise of funding in exchange for the valuable services rendered by the state's teachers. "[T]he interest of the employee . . . is in the security and integrity of the funds available to pay future benefits." (*Valdes, supra,* at p. 784.) This palpable element of exchange results in a contractual "promise", i.e., an intent to confer private rights. (See Rest.2d Contracts, § 2; see generally *id., § 21.)

The Governor argues the in lieu reductions in funding made in the State Budget Acts following enactment of section 23401 and 23402 evidence a contrary, retrospective intention. This is a circular argument; it uses evidence of a violation of a contract to show there was no contract. Like any such argument it ends, unhelpfully, where it started, which is at the precise point in issue. ■ Moreover, the view of a subsequent Legislature of the meaning of a prior legislative enactment is not controlling. (See, e.g., *Del*

*Costello* v. *State of California* (1982) 135 Cal.App.3d 887, 893, fn. 8 [185 Cal.Rptr. 582].)

The Attorney General also asserts the 1978 legislation was part of a "stopgap" response to Proposition 13 and is thus imbued with a fatal aura of tentativeness. To the contrary, no such aura emanates from the statute; it is an unambiguous commitment to permanent, long-term financing, freed from the contingencies of annual budgetmaking. In this respect the case is no different than *Valdes*.

The Governor does seek to distinguish *Valdes* as uniquely dependent on the state's employer relationship with its employees. That issue was not resolved by *Valdes*. *Valdes* ostensibly involved pension funding rights of the nonteacher personnel of local school districts. (See *Valdes, supra,* 139 Cal.App.3d at p. 776.) These employees of the local district are also Public Employees Retirement System members. (Gov. Code, § 20580 et seq.) Regardless, the *Valdes* opinion made no analysis of this question and cannot be considered controlling.

It is true, as noted by the Governor, *Taylor, supra,* remarks that the relation of teacher to the *state* is not "a contract of employment." (31 Cal.App.2d at p. 739.) This does not imply, however, that other contractual relations between teachers and the state are ruled out. (Compare 58 Ops.Cal.Atty.Gen. 402 (1975), relation between State Teachers' Retirement System and teachers is contractual.) Moreover, the distance between the state and the employment relation is measurably shorter in this context. In *Taylor* the legislative action modified the backdrop of public law governing one aspect of the contract relation between teachers and their school employers. Here the role of the state is not so aloof. Pension rights are an element of compensation of the teacher as employee. (See *Betts* v. *Board of Administration, supra,* 21 Cal.3d at p. 863.) When the state directly undertakes to provide an element of compensation of the employment relation the distancing from that relation which obtained in *Taylor* does not exist.

█ Under ordinary principles of contract law a bargain may be sealed by performance with knowledge of the offer. (See, e.g., Rest.2d Contracts, § 50.) We are informed, without dispute, that information concerning the enactment of the statutes in issue was widely disseminated to teachers by the State Teachers' Retirement System. (Also see Rest.2d Contracts, § 23, com. c.)[11] █ It is a matter of indifference whether the consideration

---

[11]Restatement Second of Contracts section 23, comment c provides: "*c. Unknown offers of rewards.* Obligations arising from unintended manifestations of assent by an offeree are imposed in order to protect the offeror in justifiable reliance on the offeree's promise. If the offer clearly contemplates no commitment by the offeree, so that no binding return promise

furnished by the teachers runs to the state. What is essential is that the reciprocal consideration was furnished to someone. (*Floyd, supra,* 54 Cal. at p. 46.)

We conclude that sections 23401 et seq. imply an intent to grant private rights of contract. When the promise to permanently fund the retirement system is accepted by teachers by initial or continued employment a contract is established.

## II

The Controller conceded this conclusion at the outset. However, in a disanalogous borrowing from *Valdes,* he implies the contract right is only a right to systematic, substantial, annual state contributions to the Teachers' Retirement Fund.[12] Accordingly, no impairment of contract occurred when in lieu appropriations of "substantial" amounts were made by the Legislature in the State Budget Acts of 1980, 1981 and 1982. It is only the Governor's reduction of the 1983 budget bill appropriation which the Controller says is an impairment. This claim raises an issue of interpretation of the contract, which is also a matter of state law. "All contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by this Code." (Civ. Code, § 1635.)

The Controller misreads the statute. It contains a straight-out promise to pay fixed and determinable sums of money. There is no reason to measure the contract right by any yardstick other than the amounts specified by sections 23401 and 23402. The measure of performance of a contractual obligation is the performance promised. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) The language of the contract is unambiguous; the state has promised to transfer amounts specified in

---

can be made and justifiable reliance by the offeror is impossible, this reason disappears. Thus if a general offer of reward to anyone who does a certain act or achieves a certain result is treated as contemplating a bargain, the only expectations to be fulfilled are those of the offeree, and he may have none unless he knows of the offer.

"Such an offer is commonly interpreted as intended to induce action by people who know of the reward. A person who acts without such knowledge is then not within the terms of the offer, even though he intends to accept any offer which may be outstanding and thus does not act gratuitously. Standing offers of rewards made by governmental bodies, however, may be regarded as intended to create a climate in which people do certain acts in the hope of earning unknown rewards. Theoretically, an act so done might create a bargain, but recovery of the reward can be justified just as well by treating the offer as a promise binding without mutual assent or consideration or as creating a non-contractual obligation."

[12]*Valdes* involved a different statutory context. It was in that context that the court found the "statutorily created contractual obligation . . . to make systematic, substantial monthly contributions to the PERS fund . . . ." (*Valdes, supra,* 139 Cal.App.3d at p. 786.)

sections 23401 and 23402 to the teachers' retirement fund. (See Civ. Code, §§ 1636, 1638.)

## III

The more sweeping defense having to do with interpretation of the contract is that a legislative power to revoke or modify future *installments* is implicit in the reserve funding scheme. That view makes the contractual obligation an annual one and invokes the interpretive canon of *strictissimi juris* (fn. 8, *ante*). We reject this approach, however, because the importation of such a provision cannot be squared with the manifest intention of the parties. "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) Interpreting the contract to permit alteration at will would entirely defeat the bargain to provide some assurance that moneys will be available to fund the pension *when due*.

As we have shown, a clear manifestation of intent to contract does not require explicit statutory acknowledgement. Similarly, the suspension of legislative control may be inferred from less than an explicit disavowal of any rights to modify the promise. " 'Nothing is to be taken as conceded but what is given in unmistakable terms *or by an implication equally clear.*' " (*Newton, supra,* 100 U.S. at p. 561 [25 L.Ed. at p. 712]; italics added.)

Here the unambiguous inference there is no retained power to modify the amounts due in future installments arises from two considerations. The first is that the future installments are provided for in a present appropriation in section 23401 et seq. which is coupled with the simultaneous repeal of the statute subjecting installments to the annual budgetary process.

Second, where the state makes a contractual offer of a reserve funding scheme for a pension plan the consideration being tendered is a measure of fiscal insurance against future adverse economic and political developments.[13] The teacher who accepts this inducement at the outset of a career, e.g. to offset prospects of higher present compensation in alternative em-

---

[13]That a burgeoning unfunded liability is not an illusory concern is well explained by the observations of Justice Stafford in *Weaver, supra*: "The great depression of the 1930's made it painfully clear that the power to levy taxes is of little value if people have no money with which to pay them. For example, taxing authorities cannot always recover money for unpaid taxes by the simple process of selling the property of defaulting taxpayers. Property can be sold only if there are purchasers with money. In addition, if people have no money, they will defer or eliminate the purchase of many items subject to state sales tax. In short, history tells us that the credit of state government rests upon a much more tenuous base than one may care to admit." (*Id.,* 80 Wn.2d at p. 487 [495 P.2d at p. 655, Stafford, J. dis. opn].)

ployment, gains nothing if the state has a retained power to periodically modify the agreement. There is no correspondence between the annual installments and each year's further employee service. If the annual installments are disrupted the annual liabilities of the plan will invade the corpus of earlier reserve funding allotments long before they are of any use to the teacher whose right does not mature for decades.

Accordingly, it is not possible to view the state's promise as divisible into *pro tanto* segments. The promise of a fiscal floor tendered by such a statutory offer is meaningless unless the state intends to suspend all legislative control. Interpretation of the promise as retaining segmented, annual controls would vitiate the contract.

As a matter of state law, to extinguish a contractual obligation it is incumbent upon the obligor to fully perform. (See Civ. Code, §§ 1473, 1477, 1682; *Cavanaugh* v. *Casselman* (1891) 88 Cal. 543, 552 [26 P. 515].) "The contract, from its terms, is incapable of apportionment, and the measure of damages in such cases is the sum fixed by the contract itself." (*McCauley* v. *Brooks* (1860) 16 Cal. 11, 38.) Accordingly, the failure to perform pursuant to the terms of the contract, i.e. to fund the system with the installments called for by section 23401 et seq., can only be viewed as an impairment of the contract. (See, e.g., 16A Am.Jur.2d, Constitutional Law, §§ 696-697.) Whether the impairment is prohibited by the contract clauses requires a further analysis.

## IV

The state occupies a unique position in the field of contract law because it is a sovereign power. This gives rise to general principles which may limit whether an impairment has accrued as a matter of constitutional law. First "[a]n attempt must be made 'to reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power," . . .'" (*Allen* v. *Board of Administration* (1983) 34 Cal.3d 114, 119 [192 Cal.Rptr. 762, 665 P.2d 534].) "Not every change in a retirement law constitutes an impairment of the obligations of contracts, however. (See *Stork* v. *State of California* (1976) 62 Cal.App.3d 465, 468 [133 Cal.Rptr. 207].) Nor does every impairment run afoul of the contract clause." (*Allen* v. *Board of Administration, supra,* at p. 119.) "'The constitutional prohibition against contract impairment does not exact a rigidly literal fulfillment; rather, it demands that contracts be enforced according to their "just and reasonable purport;" not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order. (*City of El Paso* v. *Simmons* (1965) 379 U.S. 497, 508 . . .; *Home*

*Building & Loan Assn.* v. *Blaisdell* [1934] 290 U.S. [398,] 428-429, 434-435 . . . .) The contract clause and the principle of continuing governmental power are construed in harmony; although not permitting a construction which permits contract repudiation or destruction, the impairment provision does not prevent laws which restrict a party to the gains "reasonably to be expected from the contract." (*City of El Paso* v. *Simmons, supra,* 379 U.S. at p. 515 . . . .)' " (*Allen, supra,* at p. 119-120.)

Those generalizations find no concrete application here. No issue of fettering the police power is tendered. Nor are we presented with an impairment of a private contract accomplished incidental to a disinterested legislative purpose to modify the backdrop of public law. An issue of prohibited impairment arises when the scope of the legislative impairment is not narrowly tailored to conform with an ostensible, innocent, governmental purpose. Accordingly, case law has given rise to the concept of permitted impairments as "minimal impairments." (See e.g. *Valdes, supra,* 139 Cal.App.3d at p. 789.) That is to say, the criterion of innocent purpose is that only the minimal impairment needed to attain the tendered legitimate public end has been visited upon the contracting parties. The concept of "minimal impairments" has no proper application as a vague license for the state to impair its obligation so long as it is only "a little bit."

We are presented the issue of impairment in a special context; the alteration of the state's own obligation of payment. The leading case involving such an impairment is *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1 [52 L.Ed.2d 92, 97 S.Ct. 1505]. ■ It points out that, although the state may not contract away its police power it may "bind itself in the future exercise of the taxing and spending powers." (*Id.,* at p. 24 [52 L.Ed.2d at p. 110]; fn. omitted.) In considering the standard applicable to such a *fiscal* obligation the court said: ■ "As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's *self-interest* is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." (Fns. omitted.) (*Id.,* at pp. 25-26 [52 L.Ed.2d at pp. 111-112]; italics added; see also *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 307-309 [152 Cal.Rptr. 903, 591 P.2d 1].)

■ *United States Trust* places the justification for an impairment of a contractual funding obligation under the light of strict scrutiny. (See Tribe,

American Constitutional Law (1978) p. 473; fns. omitted.) It requires the state assert a compelling interest for the impairment. (See *Sonoma County Organization of Public Employees, supra.*) *United States Trust* rules out, as a permissible justification, a legislative purpose simply to expend the obligated money for a purpose deemed a better expenditure. That is the case here. The Governor offers no justification for the breach of the contract save that implicit in the message accompanying his action reducing the budget appropriation to $1; that the "amount [reduced] can have an immediate and significant impact in other areas of education [exhibiting] more pressing needs . . . ." (See *ante*, fn. 5.)[14] This is not a purpose which justifies an impairment.[15] "If a state could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." (*United States Trust Co., supra,* 431 U.S. at p. 26 [52 L.Ed.2d at p. 112]; fns. omitted; cf. *Sonoma County Organization of Public Employees, supra.*) The same must be said of the actions of the Legislature in reducing the covenanted funding obligations by in lieu budget appropriations. No justification is offered for these reductions and therefore no compelling state interest is shown.

This is not to say that the terms of the contract set forth by sections 23401 et seq. are eternally immutable. We imply no view of the permissibility of alternation of the amount of payment in response to a change in the unfunded liability of the system. (See, e.g., *Lyon* v. *Flournoy* (1969) 271 Cal.App.2d 774 [76 Cal.Rptr. 869].) However, changed circumstances and an alternation tailored to conform thereto are matters in the nature of reformation or excuse for nonperformance of the contract. The affirmative burden of pleading and proving such a justification is on the state. (See *United States Trust Co., supra*; cf. 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 913, p. 2501.) No such claim is made here.

No cognizable justifications for the reductions in issue from the amounts provided in sections 23401 et seq. have been shown. We are bound to find them ineffectual to alter the state's obligation.

---

[14]The Governor implicitly assumes that the petitioners must show not only a breach of contractual obligation but also that breach was not a justifiable impairment of the obligation. In the case of strict scrutiny there is no burden upon the petitioners to think up and refute hypothetical reasons why the impairment was justified. Moreover, in the case of the Governor, we have been told *the* reason.

[15]We do not imply any unworthiness of the alternate use of the money. There is no question the objective stated is an important public purpose. But was it a justifiable reason for impairing the contract? *United States Trust Company* tells us the answer is no.

## V

As an afterthought the Governor makes an eleventh hour frontal assault on the validity of sections 23401 et seq.[16]

 A court cannot order the appropriation of money. (Cal. Const., art. III, § 3; *Mandel* v. *Myers* (1981) 29 Cal.3d 531, 542 [174 Cal.Rptr. 841, 629 P.2d 935].) However, a court can void a legislative impairment of a valid contractual obligation and compel compliance with the obligation. (*McCauley* v. *Brooks, supra,* 16 Cal. at pp. 39-47.) Where the obligation, as here, is to pay money and is contained in a statutory appropriation, we can direct compliance which carries the attendant monetary consequences. The Governor seeks to block this avenue with the contention the appropriation of section 23401 et seq. are invalid. He relies on the provision in the California Constitution that: "No bill except the budget bill may contain more than one item of appropriation, and that for one certain, expressed purpose." (Cal. Const., art. IV, § 12, subd. (d).) The Governor argues section 23401 et seq. violate the "one item" rule because they were a part of a complex measure appropriating money to multiple public entities in addition to the retirement fund. The contention lacks merit.

 The seminal authority on the "one item" requirement is *Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159 [28 Cal.Rptr. 724, 379 P.2d 28]. There the Supreme Court equated the "one item" requirement with "single subject" rule of (former) California Constitution article IV, section 24 (now art. II, § 10) which limits the subjects of a single legislative enactment. (*Metropolitan, supra,* at pp. 174-175.) The court said the presence of multiple appropriations in an act does not necessarily violate the one item limitation. "Where a statute sets up a number of special funds for a single purpose, or there are a number of allocations of money from different funds for that one purpose, the allocations, considered together, should be treated as being only 'one item of appropriation.'" (*Id.,* at p. 174.)[17] This rule applies here.

 The unifying theme of the enactment which included section 23401 et seq. is set forth in its declaration of urgency. "The adoption of

---

[16]The Attorney General failed to raise this significant point in his briefs and delayed its introduction into these proceedings until petitioners had exhausted their time to speak at the oral argument on this matter. Ordinarily we would decline to entertain this argument as not seasonably raised. However, we address this issue so as not to leave lingering doubts about the vitality of the statutory appropriation. As we have concluded the argument is unpersuasive, there is no need for further delay to permit petitioners to reply.

[17]We note that an appropriation of money not yet in the treasury for future disbursements in installments is permitted. (See, e.g., *McCauley, supra,* 16 Cal. at p. 28.) Installment disbursement does not "militate against singleness of appropriation or of object." (*City of Los Angeles* v. *Post War etc. Bd.* (1945) 26 Cal.2d 101, 117 [156 P.2d 746].)

Article XIIIA of the California Constitution has reduced the amount of property tax revenues available to local government and schools to meet operating and certain debt expenses, and may cause the curtailment or elimination of programs and services which are vital to the state's public health, safety, education, and welfare. In order that such services not be interrupted, it is necessary that this act take effect immediately." (Stats. 1979, ch. 282, § 106, p. 1059.) Simply put, the single purpose of the measure was the restructuring of the public finance of local public entities in response to the enactment of Proposition 13 which cut a wide swath through their funding.[18] An appropriation addressing the debt expense of unfunded pension liability is reasonably germane to this general purpose. In the circumstances presented by the adoption of article XIII A we find no constitutional flaw in enacting one complex appropriation measure which finances the services which were financially impaired.

For these reasons we conclude section 23401 et seq. are a valid appropriation. As such they are an adequate predicate for ordering the relief requested by petitioners. (See *Valdes, supra,* 139 Cal.App.3d at pp. 792-793.)[19]

## VI

The remaining points raised by the parties require little discussion.[20] ▮ Petitioners request interest be awarded on the amounts owing under section 23401 et seq. pursuant to Civil Code section 3287. No party argues against entitlement to interest and we accept the implied concession. (See *California State Employees' Assn.* v. *Cory* (1981) 123 Cal.App.3d 888, 891 [176 Cal.Rptr. 904]; compare *Olson* v. *Cory* (1983) 35 Cal.3d 390 [197 Cal.Rptr. 843, 673 P.2d 720].) However, no money to pay such interest was appropriated in section 23401 et seq. Moreover, the amounts appropriated by those provisions will be exhausted by the relief we will order. (See *Baggett* v. *Dunn* (1886) 69 Cal. 75, 78 [10 P. 125], exhaustion of appropriation by payments extinguishes authority to draw upon it.) While we recognize petitioners' right to prejudgment interest we are unable to compel

---

[18]Since Proposition 13 survived the single subject test (*Amador County Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281]) it would be anamolous to conclude the Legislature's response did not. The same sauce flavors both.

[19]Though it is not raised we note that the statute of limitations applicable to this variety of obligation is four years from the date of breach. (*McCord* v. *Slavin* (1904) 143 Cal. 325, 333 [76 P. 1104].) As such, none of the performance in issue is cloaked by the statutes of repose.

[20]In view of our resolution of the foregoing point we have no occasion to consider petitioners' contention that unilateral abrogation of the funding obligation takes away a vested property right without due process of law.

vindication of the right in these proceedings. (*California State Employees' Assn.* v. *Cory, supra,* at pp. 891-895.)

 Petitioners also seek attorneys' fees for prosecution of these proceedings. Their first ground is Government Code section 800. That statute is inapposite; this is not an appeal or review of an administrative proceeding. (*Ferris* v. *Los Rios Community College Dist.* (1983) 146 Cal.App.3d 1, 11 [194 Cal.Rptr. 16].) Their alternate ground is Code of Civil Procedure section 1021.5. That section provides that a prerequisite of entitlement to recovery of attorneys' fees is whether "the necessity and financial burden of private enforcement are such as to make the award appropriate . . . ." Here it is not. The large sums in issue will accrue to the direct benefit of the members of the State Teachers' Retirement Fund, of whom a significant portion are members of the California Teachers Association. In these unique circumstances we hold the magnitude of the benefit is such that the financial burden placed on petitioner CTA is not out of proportion to the personal stake of its members. (Compare *Baggett* v. *Gates* (1982) 32 Cal.3d 128, 143 [185 Cal.Rptr. 232, 649 P.2d 874]; and *id.,* at pp. 144-146 (dis. opn. Kaus, J.).)

DISPOSITION

Let a peremptory writ of mandate issue directing the respondent State Controller to comply with his legal and ministerial duties imposed by section 23401 et seq. and to transfer the full amounts required by those provisions without limitation by the provisions of the State Budget Acts of 1980-1981, 1981-1982, 1982-1983 and 1983-1984. The Governor shall bear the costs of these proceedings.

Carr, J., concurred.

**REGAN, Acting P. J.**—I dissent. I fully agree with the Governor that the statutory appropriations in Education Code sections 23401 and 23402 do not create a contract with the members of State Teachers' Retirement System (STRS). These appropriations to the reserve fund were born of a crisis to meet the financing of local government and school districts, and not of an effort to contract with members, whereby the state would provide capitalization of the unfunded liability of the reserve fund in return for teachers' continued employment. I find no adequate manifestation in sections 23401 and 23402 of a promise giving rise to a contractual obligation. Nor is there any manifestation of any "permanance of a continuing obligation" to fund the reserve fund solely by the included formulae.

Nor do I see any "unambiguous element of exchange of consideration by a private party for consideration offered by the state." In fact, I fail to see

how continuing employment by teachers in the plan somehow constitutes "acceptance" of an "offer" to finance the unfunded liability in outyear dollars. I cannot imagine any member contemplating quitting his or her job or participation in the plan for fear that *in lieu* appropriations may gut the chance for a fully funded account. Not only is there no "offer" here; there is no "acceptance."

Under a "defined benefit plan" such as STRS, members are assured of receiving defined benefits upon retirement based on formulae that take into account years in service, salary level and similar criteria. Contributions to such a plan may have little relationship to the value of benefits earned by a specific employee.[1] Contributions and appropriations may be on a "pay-as-you-go" basis, or reserves may be compiled actuarilly sufficient to generate adequate investment income to meet future obligations, and thus, make the plan "fully funded."[2]

These appropriations are clearly intended to amortize the unfunded liability so as to enable sufficient investment capital to accrue to meet future obligations. No benefit or element of compensation is provided for in the statutes. The majority relies on *County of San Luis Obispo* v. *Gage* (1903) 139 Cal. 398 [73 P. 174], in implying a contract in the appropriations. Unlike *Gage,* however, the statutory appropriations in the instant case are not for the direct support or maintenance of anyone. Nor is there any "sub-

---

[1]In a "defined benefit plan," the employer undertakes to provide a specified level of retirement income, as opposed to a "defined contribution plan," where the employer makes specified contributions to an individually allocated investment account. In a "defined benefit plan," employer contributions are determined on the basis of a specific actuarial funding method which seeks to smooth contribution requirements as a percentage of payroll over a long period, reflecting overall funding requirements, and they are not allocated to individual accounts. However, in the instant case, state appropriations are *not* based on a percentage of payroll. Such appropriations simply capitalize the fund to allow investment financing to meet outyear obligations.

For background, see testimony of and appendix topic paper by Robert D. Krinsky, "Defined Benefit/Defined Contribution: A Comparison," in U.S. Senate subcommittee report *Forums on Federal Pensions* (Subcom. on Civil Service, Post Office and General Services of Com. on Gov. Affairs), pages 59-60, 152-158.

[2]In most public "defined benefit" retirement plans, there is no legal requirement to be fully funded, whereas there is generally a 40-year amortized funding mandated for private plans subject to the federal Employee Retirement Income Security Act of 1974 (ERISA). In any case, the retirement fund here is solvent. As of September 30, 1983, the STRS investment portfolio had $10.5 billion, based on an October 1/September 30 year-to-year survey, as reported in "Annual Survey of 1000 Largest Pension Funds" in *Pension and Investment Age,* January 23, 1984 issue. The September 1982 STRS Funding Study by Weston Hulse, Controller's Exhibit 1, noted that in 1981/1982 total income from contributions and investment return was almost $2 billion, "while benefit payments, refunds, and administrative costs totalled only $800 million, leaving 1.2 billion to add to investments." (*Funding Study, supra,* at p. 12.) Although the unfunded obligation increases regularly, the investment portfolio is increasing by over $1 billion dollars a year.

sequent performance" of any condition by anyone here, which in *Gage,* in combination with the legislation there, furnished "all the elements which are necessary to the formation and existence of an implied contract." (*Gage, supra,* at p. 408.) Nor on any other authority are these appropriations unconditional or unilateral implied contracts.

I concurred in *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773 [189 Cal.Rptr. 212], in finding a contractual obligation in contributory payments of the state to the Public Employees' Retirement System (PERS). However, there are important factual differences between *Valdes* and the instant case.

In *Valdes,* I was impressed by the Public Employees' Retirement Law provision that the monthly contributions to the retirement fund were "continuing obligations of the State." (139 Cal.App.3d, at p. 787.) Furthermore, I saw a deeper and greater obligation in the state to make payments to a plan which originally involved the payment of retirement salaries to *state employees,* wherein the state, as employer, was making the employer contribution for the direct benefit of the employee. Further yet, the duties of actuarial investigation and reporting as well as the conduct of the state over 50 years manifested an intent "that periodic employer contributions will not be altered . . . ." (*Ibid.*) In the instant case, however, the statutory scheme does not contain the kind of express language which we had found in *Valdes,* and which in that case led to our conclusion that a contractual obligation was implied. There is nothing in this case which makes an *in lieu* appropriation offensive.[3] Unlike "the continuing obligations of the State" in *Valdes,* the statutory appropriations in the instant case were part of a stop-gap measure necessitated by the property tax initiative known as "Prop. 13" to provide a upward-sliding scale of state funding to the reserve fund.

I have agreed in the past that employee pension beneficiaries have a vested interest in the integrity and security of the source of funding for the payment of benefits (*Valdes* v. *Cory, supra,* 139 Cal.App.3d at p. 785.) We stretched that interest into a contractual right in *Valdes,* travelling far from the contractual interest the *employee* had in his or her *direct* pension benefits.

However, in the instant case, I do not think we can stretch the interest in the *input* to this reserve fund so far. As we discussed in *Valdes,* the con-

---

[3]In *Valdes,* the challenged provisions of chapter 115 of Statutes of 1982, reduced or suspended *employer* contributions (§ 14, subd. (b)), *state-employer* contributions (§ 58), and *school district-employer* contributions (§ 59). In section 58, the PERS Board was mandated to transfer monies from its reserve against deficiencies into the unallocated portion of the PERS retirement fund in order to permit the reversion to the unappropriated surplus of the general fund monies *already appropriated* in the 1981-1982 budget to the PERS retirement fund.

tractual pension rights discussed in *Betts* v. *Board of Administration* (1978) 21 Cal.3d 859 [148 Cal.Rptr. 158, 582 P.2d 614], are the rights to "pension *benefits*," as an element of compensation. (*Id.*, at p. 863; italics added.) In *Valdes*, we concluded the vested rights of PERS members were impaired when the Legislature directed funds held in trust for the exclusive benefit of the members and beneficiaries of PERS be used to satisfy the state's contractual obligations to make its monthly contribution to the retirement fund. (*Valdes, supra,* 139 Cal.App.3d, at p. 788-789.) We first concluded there was a contractual obligation by the state to "abide by its 'continuing obligation'" (*id.*, at p. 787), and then we found the legislative action in that case impaired the vested contractual rights of PERS members.

As I have stated, I do not find the same contractual interest in the input to the reserve fund as we found in *Valdes*. Secondly and consequently, I see no impairment of any vested rights to members of STRS. In the instant case, the annual *in lieu* appropriations do not suspend any employer contributions, nor do they change the source of contributions as was done in *Valdes*. The *in lieu* appropriations have no effect on the *benefits,* nor is the plan being changed to any member's disadvantage. Thus, the *in lieu* appropriations offend neither *Betts* nor *Valdes*. In any case, as I see no contractual obligation in the law, the questions of impairment, alteration, and segmentation are irrelevant.

I am convinced this is a dangerous thing to do—to read contractual obligations into statutes which may remotely, rather than directly, affect beneficiaries. As we noted in *Valdes*, it is elementary the Legislature has power, absent constitutional restrictions, expressly to amend or repeal existing statutes. By extending the basis of constitutional infirmity into statutes such as this, we tie the hands of this and future Legislatures.

"It is the general rule that one legislative body cannot limit or restrict its own power or that of subsequent Legislatures and that the act of one Legislature does not bind its successors." (*In re Collie* (1952) 38 Cal.2d 396, 398 [240 P.2d 275].) This is, of course, subject to constitutional limitations. (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].) However, "all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and not to be extended to include matters not covered by the language used.' [Citations.]" (*Ibid.*)

In this case, I do not find an adequate manifestation of a promise giving rise to a contractual obligation. As I see no contract in the statutory appro-

priations, I do not find the annual *in lieu* appropriations constitutionally infirm.

I would deny the writ.

The petitions of real parties in interest and interveners for a hearing by the Supreme Court were denied August 20, 1984.