Filed 3/27/25 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES, <br><br> Defendant and Respondent; <br><br> INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 18, <br><br> Intervener and Respondent. | B322224 <br><br> (Los Angeles County Super. Ct. No. BS166535) <br><br><br> **ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING; THERE IS A CHANGE IN APPELLATE JUDGMENT** |

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part B of the Discussion.

THE COURT:

It is ordered that the opinion filed herein on February 27, 2025 be modified as follows:

On page 28, under the DISPOSITION, the word "Employees" is deleted so that the sentence now read "The City and Local 18 are entitled to recover their costs on appeal."

On page 23, footnote 9, delete the following fragment from the last sentence: "to treat DWP and the City as a 'single employer,' much less" so that the last sentence now reads "The fact that these separate retirement systems are both under the umbrella of the City of Los Angeles does not provide a basis to conclude either LACERS or WPERP members have a vested right to transfer between DWP and the City without any effect on their pension."

There is a change in the appellate judgment.

The respective petitions for rehearing filed by respondent City of Los Angeles and respondent International Brotherhood of Electrical Workers, Local 18, are denied.

MARTINEZ, P. J.          SEGAL, J.          STONE, J.

2

Filed 2/27/25 (unmodified opinion)

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES, <br><br> Defendant and Respondent; <br><br> INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 18, <br><br> Intervener and Respondent. | B322224 <br><br> (Los Angeles County Super. Ct. No. BS166535) |

      APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge.  Affirmed.
      Rothner, Segall & Greenstone, Hannah Weinstein and Julia Harumi Mass for Plaintiffs and Appellants.

---

*      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part B of the Discussion.

Kronick, Moskovitz, Tiedmann & Girard, David W. Tyra and Alec D. Tyra for Defendant and Respondent.

Schwartz, Steinsapir, Dohrmann & Sommers, D. William Heine, Daniel E. Curry and Alejandro Delgado for Intervener and Respondent.

———————————

This appeal arises from the cessation of a Reciprocal Retirement Benefits Arrangement (Reciprocal Arrangement) for the transfer of employee pension contributions when public employees move from job positions with the Los Angeles Department of Water and Power (DWP) to the City of Los Angeles (City), or vice versa. The Reciprocal Arrangement was in effect from 1980 to 2013, but in 2013 DWP withdrew from it. The City (one of the respondents) followed suit by adopting Ordinance No. 182824 (the 2013 Ordinance), which suspended the Reciprocal Arrangement. City employees and their unions[1] (the petitioners, collectively City Employees) brought an action against the City, asserting the 2013 Ordinance impairs and

---

[1]  This case was brought by the Coalition of City of Los Angeles Unions, which represents current and former City employees whose retirement benefits are administered by the Los Angeles City Employees' Retirement System—American Federation of State, County, and Municipal Employees and its Local Unions 741, 901, 2006, 2626, 3090, and 3672; International Union of Operating Engineers, Local 501; Laborers International Union of North America, Local 777; Los Angeles and Orange County Building & Construction Trades Council; Service Employees International Union, Local 721; and Teamsters Union Local 911—as well as three individual City employees—Veronica Salumbides, Albert Scott, and Charley Mims.

diminishes employees' vested retirement benefits in violation of the contract clause of the California Constitution. The City Employees also argue the 2013 Ordinance violates other provisions of the Los Angeles Administrative Code[2] by forcing some employees to forfeit health benefits. In the published portion of the opinion, we conclude the suspended terms of the Reciprocal Arrangement were not vested rights and thus find no constitutional violation by the City. In the unpublished portion, we determine the City Employees have shown no violation with respect to employee health benefits. We thus affirm the superior court's denial of the petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Different Los Angeles City Retirement Plans*
      The City provides retirement benefits to its employees through different retirement systems. One is the Los Angeles City Employees' Retirement System (LACERS), for City officers and employees not included in any other retirement system. (Los Angeles City Charter, §§ 1102, subd. (a), 1150.)[3] The Los Angeles City Council (City Council) has exclusive authority, authorized by the Charter, to establish or modify LACERS benefits through ordinances. (Charter, § 1168.) LACERS benefits are codified in sections 4.1000 et seq. of the Administrative Code. (Charter, § 1150.) The LACERS Board of Administration administers these benefits. (Charter, §§ 1104, subd. (b), 1106.)

---

[2]    Undesignated section references are to the Los Angeles Administrative Code.

[3]    Charter references are to the Los Angeles City Charter.

DWP provides retirement benefits through the Water and Power Employees' Retirement Plan (WPERP). (Charter, § 1180.) DWP, along with the Departments of Airports and Harbor, is a "Proprietary Department" within the City. (Charter, § 600, subd. (a).) It operates autonomously and has independent funding and a separate budget from the City. (Charter, § 603, subd. (a).) The DWP Board of Administration governs its funding and budget. (Charter, §§ 600, subd. (b), 603, subd. (b).) As the City has regarding LACERS, DWP has the authority to modify WPERP benefits, and the WPERP Board manages and administers WPERP and its funds. (Charter, §§ 1104, subd. (c), 1106, 1186.)

B.     *The Development of the Reciprocal Arrangement Between LACERS and WPERP*

In 1975, the City Council acknowledged employees who moved between the City and DWP could "suffer a decrease in benefits" because an employee's transfer of retirement system membership triggered a new contribution rate based on the employee's age of entry into the second retirement system. That amount could be "substantially greater than the original contribution rate" under the previous retirement system.

To counteract the adverse effects, the City Administrative Officer (CAO) recommended to the City Council's Personnel and Labor Relations Committee (Personnel Committee) a "reciprocal benefits arrangement between the retirement systems." The CAO proposed an arrangement in which each retirement system would be responsible for paying retirement benefits based upon the "period of service for which retirement credit was earned with each respective system," using the employee's highest

4

compensation earned and the combined years of service at the City and DWP.

The CAO and the City Attorney determined the Charter had to be amended before reciprocity could be implemented. In 1977, voters approved the Charter amendment, which allowed WPERP to enter into a reciprocal agreement with LACERS "relative to the benefits and contributions of employees who transfer between the two systems." The Charter amendment was enabling only—the City Council, the WPERP Board, and the DWP Board still had to approve any reciprocal agreement.

Throughout 1977 and 1978, the CAO, LACERS, and WPERP worked out the details of a reciprocity agreement. In early 1979, DWP presented an "alternative proposal for reciprocity" providing the contributions and service credit of a transferring employee would be transferred from one system to the other. Every year, each system would determine "the amount of member contributions which should have been deposited by each transferring member. The system which receives less than the required amount of contributions from transferring employees would be made whole by the system the transferring employees left."

C. *The Reciprocal Arrangement Between LACERS and WPERP from 1980 to 2013*

The Personnel Committee recommended the City Council adopt DWP's counterproposal "[i]n order to proceed toward the goal of providing reciprocal retirement benefits between [LACERS] and WPERP by providing at this time only certain limited portability provisions." In December 1979, the City Council adopted Ordinance No. 153,294, codified as former

5

section 4.1060 of the Administrative Code.  The preamble stated the purpose of the ordinance was "to aid in the implementation of a reciprocal retirement benefit arrangement between [LACERS] and [WPERP] and to provide benefits for members of [LACERS] transferring from [LACERS] to [WPERP] and vice versa." (Former § 4.1060.)  The section became effective in February 1980.  In 2013, it was renumbered as section 4.1095.

Section 4.1095, subdivision (b), states that, upon transferring from DWP to a City department, an employee immediately becomes eligible for membership in LACERS. "Membership shall entitle the system member to all benefits for retirement, disability and death for which he or she would qualify based upon his or her total service in both the LACERS and the WPERP."  Subdivision (d) provides that an employee may opt out of the Reciprocal Arrangement.  (§ 4.1095, subd. (d).)  Unless the transferring employee opts out, WPERP must transfer service credits, along with the employee's accumulated retirement contributions, to LACERS.  (§ 4.1095, subd. (e).)

Section 4.1095, subdivision (k), provides:  "**Reciprocity of Benefit Provisions and Conditions Affecting this Section.** It is the intent and purpose of this section to provide, or help to provide, portability between the LACERS and the WPERP.  The achievement of complete portability of benefits is dependent upon appropriate action by the governing body of the WPERP.  Should the implementation of any provisions of this section be possible only if some specific action is taken by the WPERP, then, and as to such provisions only, the effect of this section shall be suspended until appropriate action has been taken by the WPERP."

Under the Reciprocal Arrangement, employees who moved between the City and DWP (in either direction) could transfer employee pension contributions and interest (but not the employer's contributions) to their new pension plan. (§ 4.1095, subd. (e).) The new pension plan had to recognize all service credit earned by the employee under the former system and assume any associated pension liability. Employees contributed at the same retirement contribution rate before and after their transfers. When employees retired, their most recent pension plan paid all their benefits, which were calculated based on the employees' total years of service in both LACERS and WPERP and the last highest 12 months of salary.

When the City and DWP devised the Reciprocal Arrangement, they anticipated that the number of employees transferring from the City to DWP and from DWP to the City would be roughly the same. Between 1980 and 1991, the Reciprocal Arrangement required LACERS and WPERP to calculate every year whether transfers into their plans were over- or under-funded and to bill the other plan accordingly. (Former § 4.1060, subd. (13).) This "annual adjustment" was included to protect the plans from "massive differences in employee contribution rates." In 1991, however, LACERS determined that the cost of performing the calculations outweighed the benefits of recouping the small amounts actually billed, mostly because of the near parity of employees transferring in either direction. In 1993, the City removed the annual adjustment provision from the Administrative Code, thus eliminating the mechanism for correcting funding imbalances between LACERS and WPERP.

7

D.    *WPERP's Suspension of Reciprocity and the* Romero *Litigation*

In approximately 2009, amid the "Great Recession," the City began encouraging employees to transfer to DWP and other Proprietary Departments as a way to address a budgetary crisis and avoid City layoffs.  In 2010, in response to a concern that more employees were transferring from the City to DWP than in the other direction, the WPERP Board commissioned a study to determine the financial impact of the Reciprocal Arrangement.  The study found that, between April 2004 and March 2010, 1,623 employees transferred from the City to DWP, but only 270 employees transferred from DWP to the City.  As a result, WPERP's unfunded liability had increased by approximately $183 million, while LACERS experienced a comparable decrease.

In May 2010, the WPERP Board voted to suspend the Reciprocal Arrangement for all employees transferring from the City to DWP while it examined the situation further.  In October 2010, the City Council voted to veto the WPERP Board's suspension.

In November 2010, WPERP filed suit in Los Angeles Superior Court to enjoin the City Council from refusing to recognize the WPERP Board's suspension of the Reciprocal Arrangement.  (See *Romero, et al. v. City Council of the City of Los Angeles, et al.* (2013, No. BC449834) (*Romero*).)  The City Employees and LACERS were not parties to the *Romero* lawsuit and did not seek to intervene.

The City demurred on the grounds that WPERP lacked standing and the Reciprocal Arrangement between LACERS and WPERP was a retirement benefit that only the City, through legislative action, could implement or remove.  In December

8

2012, the trial court overruled the City's demurrer. The City filed a petition for writ of mandate asking this court to overturn the trial court's decision.

We denied the City's writ petition. (*City of Los Angeles v. Superior Court of Los Angeles County et al.* (Nov. 19, 2013, B246933) [nonpub. opn.].) In doing so, we rejected the City's assertion that "reciprocity in this case is the kind of retirement benefit with respect to which only the City, and not WPERP (or LACERS), can take action." Rather, we determined the City failed to demonstrate reciprocity was a "benefit" to which members of WPERP or LACERS were entitled. We determined the applicable Administrative Code provision (then section 4.1060, later renumbered as section 4.1095) "indicates that reciprocity is not a retirement benefit granted by the City, but rather it is an agreement between the City and WPERP authorizing portability of retirement benefits." We also noted that "[r]eciprocity was not established solely by the City Council as the City's legislative body, but rather it required the approval of WPERP."[4]

The City and WPERP subsequently settled the *Romero* litigation, and the City agreed to suspend the Reciprocal Arrangement between LACERS and WPERP. Respondent

---

[4]     No doubt recognizing the City Employees were not a party to or in privity with any party to the *Romero* litigation, respondents do not argue any of our holdings in *Romero* should be given collateral estoppel effect here. (See *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824 [collateral estoppel applies "against one who was a party in the first suit or one in privity with that party"]; accord, *Cruz v. City of Merced* (2023) 95 Cal.App.5th 453, 471.)

9

International Brotherhood of Electrical Workers, Local 18 (Local 18), the exclusive bargaining representative of about 9,500 DWP employees and interveners in this case, was a party to the settlement.

One of the settlement terms was that "[f]or each member who moves from a position covered by WPERP to a position covered by LACERS or from a position covered by LACERS to a position covered by WPERP after the effective date of the amendment to suspend [the Reciprocal Arrangement], each retirement plan (WPERP and LACERS) will be fiscally responsible only for the years of service and final average salary the member earned while a member of that retirement plan." The settlement also provided employees would be able to purchase time served with the other system at "full actuarial value."

E.     *The 2013 Ordinance's Suspension of Reciprocity*

In December 2013, the City adopted the 2013 Ordinance "to suspend reciprocity between [LACERS] and [WPERP], and to make related changes." Among other changes, the 2013 Ordinance (effective January 1, 2014) enacted new subdivision (l) to existing section 4.1095, which provides: "**Suspension of the Reciprocal Retirement Arrangement.** Employees who change employment from the DWP to other positions with the City that make them eligible for membership in LACERS on or after January 1, 2014, shall not be eligible to participate in the reciprocal retirement arrangement established in this section. Reciprocity on the terms and conditions set forth in this section shall only be provided to those employees who changed employment from the DWP to other positions with the City that

10

made them eligible for membership in LACERS prior to January 1, 2014."

As a result of the 2013 Ordinance, employees who transfer from WPERP to LACERS after January 1, 2014 are ineligible for a transfer of benefits under the Reciprocal Arrangement. Depending on the LACERS tier into which they fall, transferring City employees may not receive credit from LACERS for their prior WPERP service. (See §§ 4.1080.5, subd. (c), 4.1080.6, subd. (c), 4.1080.7, subd. (b), 4.1080.8, subd. (k).)

F.      *Trial Court Proceedings*

In December 2016, the City Employees filed a verified petition for writ of mandate,[5] with causes of action against the City and LACERS, among others not relevant to this appeal, for (1) the unconstitutional impairment of vested contractual rights in violation of the California Constitution, and (2) the violation of sections 4.1102 and 4.1111 by "Respondents' use of vested retiree health Employee Contributions to pay for retirement, disability retirement and/or survivorship benefits by transferring employees." The City Employees alleged "LACERS members have vested contractual rights to receive, and LACERS has a ministerial duty to pay, full career City service retirement benefits calculated at the employees' final compensation and retiree health benefits from LACERS for the employees' aggregate City service with both the DWP and in LACERS-

---

[5]      A petition for writ of mandate under Code of Civil Procedure section 1085 "is proper where . . . the claim is that an agency has failed to act as required by law." (*California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 705.)

11

covered positions." The City Employees did not challenge WPERP's authority to suspend reciprocity or make any claim against WPERP or DWP. No evidence was submitted that employees were induced into working for the City or DWP based on the promise of reciprocity or portability of their pension benefits.

In September 2021, the trial court granted Local 18's motion to intervene. Local 18 requested the court deny the petition, arguing that the opportunity to transfer between the WPERP and LACERS retirement systems was not a "vested" right protected by the constitutional contract clause, and even if it were, the City's elimination of that benefit was not an unconstitutional impairment of employees' vested pension rights.

In May 2022, the court denied the petition. Relevant here, the court found that the City Employees had failed to establish that they had a vested contractual right to the Reciprocal Arrangement that was protected by the California Constitution. The court also found there was no evidence to support the City Employees' claim that their 4 percent contributions toward retiree health benefits were being improperly applied to pension benefits in violation of sections 4.11021 and 4.1111.

In July 2022, the trial court entered judgment in favor of the City, LACERS, and Local 18. The City Employees' appeal was dismissed with prejudice as to LACERS under a stipulation between the City Employees and LACERS, leaving only the City Employees' claims against the City to be addressed on appeal.

The City Employees timely appealed. Respondents are the City and Local 18.

**DISCUSSION**

A. *The City Employees Do Not Have Vested Rights to the Terms of the Reciprocal Arrangement*

The City Employees assert that for those employees who initiated employment with DWP during the period that the Reciprocal Arrangement was in effect, from 1980 to 2013, an implied contract was formed guaranteeing that the pensions owed would not lose value as a result of their transferring from DWP to the City. The City Employees contend they had constitutionally protected, vested rights to these terms of the Reciprocal Agreement. However, the diminished rights about which they complain are not their rights to the pension benefits, but rather to the terms of the Reciprocal Arrangement, which were not constitutionally guaranteed.

1. *The scope and effect of the 2013 Ordinance*

The 2013 Ordinance, which suspended the Reciprocal Arrangement when it took effect on January 1, 2014, was not retroactive. Retirees or current employees who transferred between DWP and the City prior to January 1, 2014 (but not after), or continued working in the same position with no such transfers, would not experience any change in pension benefits as a result of the 2013 Ordinance. The suspension of reciprocity under the 2013 Ordinance would impact only the pensions of those employees who transfer between DWP and the City, or vice versa, *after* January 1, 2014.

The suspension of reciprocity could affect such employees in several important ways. For instance, because total years of service credit is a multiplier in the benefits calculation, years spent at one department would have previously combined with

13

years at the other to create a larger multiplier. However, following the suspension of the Reciprocal Arrangement, WPERP service cannot be used for calculating an employee's LACERS benefit allowance unless the member purchases WPERP credit. (§ 4.1007, subd. (d).) As a result, employees who transferred after January 1, 2014, and halfway through their career, could experience a more than $1,000 per month reduction in a WPERP-LACERS combined retirement allowance because of the 2013 Ordinance. The City Employees submitted evidence that one of the individual plaintiffs will receive $29,000 less per year in retirement benefits as a result of the suspension of the Reciprocal Arrangement. In addition, although employees transferring to LACERS from DWP after January 1, 2014 may purchase credits for their prior WPERP service, as a result of the 2013 Ordinance, employees would have to pay for both the employee and employer contributions. (§ 4.1020.1, subds. (a)-(c).) The 2013 Ordinance estimates that two years of WPERP credit would cost $60,000 for an employee earning $100,000 annually. (§ 4.1020.1, subd. (c).)

2. *Applicable law and standards of review*

The City Employees' claim is founded on the concept of vested rights. "The vested rights doctrine . . . is grounded in the constitutional contract clause." (*Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965, 976-977 (*Cal Fire*).) The California Constitution, which provides that a "law impairing the obligation of contracts may not be passed" (Cal. Const., art. I, § 9), "prohibit[s] the enactment of laws effecting a 'substantial impairment' of contracts, including contracts of employment." (*Cal Fire*, at p. 977; see *Fry v. City of Los Angeles* (2016) 245 Cal.App.4th 539, 548 (*Fry*) ["The contracts clause limits the power of public entities to, by enacting a law,

14

unilaterally modify their own contracts with other parties."].) But "not every legislative impairment of contractual relations triggers the contract clause." (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1075 (*Alameda County*).)

Unlike private employment, the terms and conditions of public employment are generally established by statute rather than by contract. (*Cal Fire*, *supra*, 6 Cal.5th at p. 977.) Consequently, most terms and conditions of public employment, including compensation and benefits, are *not* protected by the contract clause and may be " 'modified or reduced by the proper statutory authority.' " (*Ibid.*; see *Hinchliffe v. City of San Diego* (1985) 165 Cal.App.3d 722, 725 ["Public employment, by and large, is not held by contract, but by statute," and thus the public employee "can have no vested contractual right in the *terms* of his or her employment, such terms being subject to change by the proper statutory authority."].) "Contract clause protection of the terms and conditions of public employment historically has been the exception, rather than the rule." (*Cal Fire*, at p. 977.) In this context, "vested rights" are those terms and conditions of public employment that *are* protected from impairment by the contract clause. (*Ibid.*)

Public employees' pension rights are considered vested rights. (*Cal Fire*, *supra*, 6 Cal.5th at pp. 979, 983; accord, *Alameda County*, *supra*, 9 Cal.5th at p. 1074 ["The terms of public employee pensions are protected by the constitutional contract clause."].) "[T]hrough his or her service, a public employee acquires a constitutionally protected implied contractual right to receive statutory pension benefits upon

15

retirement." (*Cal Fire*, at p. 983.)[6] "Upon accepting public employment, one acquires a vested right to a pension based on the system then in effect, and to additional pension benefits conferred during his or her subsequent employment." (*Protect Our Benefits v. City and County of San Francisco* (2015) 235 Cal.App.4th 619, 628; accord, *Fry, supra,* 245 Cal.App.4th at p. 550.)

The rationale for the constitutional protection of pension benefits, despite their statutory foundation, is that they are a form of deferred compensation. (*Cal Fire, supra,* 6 Cal.5th at pp. 983-985.) A public employee " 'is not fully compensated upon receiving his salary payments because, in addition, he has then earned certain pension benefits, the payment of which is to be made at a future date.' " (*Id.* at pp. 984-985; accord, *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 855 (*Kern*).) The objective of offering a pension—"to induce competent persons to enter and remain in public employment"—"would be thwarted if a public employee could be deprived of pension benefits, and the promise of a pension annuity would either become ineffective as an inducement to public employees or it would become merely a

---

[6]    There are two ways vested rights are created: (1) "when the statute or ordinance establishing the benefit and the circumstances of its enactment clearly evince a legislative intent to create contractual rights," and (2) when courts have determined certain benefits (primarily pension rights) are vested rights "by implication, even in the absence of a clear manifestation of legislative intent." (*Cal Fire, supra,* 6 Cal.5th at pp. 978-979.) The City Employees rely on the second way and eschew any reliance on the first means of establishing that a vested right is at issue here.

snare and a delusion to the unwary." (*Kern*, at p. 856.)

" 'While payment of these [pension] benefits is deferred, and is subject to the condition that the employee continue to serve for the period required by the statute, the mere fact that performance is in whole or in part dependent upon certain contingencies does not prevent a contract from arising, and the employing governmental body may not deny or impair the contingent liability any more than it can refuse to make the salary payments which are immediately due.' " (*Cal Fire, supra*, 6 Cal.5th at p. 986.) " 'Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity.' " (*Id*. at p. 983; see, e.g., *Kern, supra*, 29 Cal.2d at pp. 852-853, 855-856 [firefighter had a vested right to his pension earned through work already performed, and city could not, shortly before the firefighter was going to retire, eliminate pensions]; *United Firefighters of Los Angeles City v. City of Los Angeles* (1989) 210 Cal.App.3d 1095, 1101 [charter amendment imposing cap on cost of living adjustments for pension benefits impaired pension right]; *California Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494, 506 [state may violate the contract clause by failing to fulfill its statutory obligation to make continuing contributions to its employees' retirement fund so as to preserve the actuarial soundness of the fund].)

Whether an employee benefit related to a pension "is a benefit of employment protected by the constitutional contract clause—that is, whether it is a vested right—is a question of law subject to our independent review." (*Cal Fire, supra*, 6 Cal.5th at p. 976; accord, *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1129.) The interpretation of a municipal

17

ordinance or charter is also a legal issue subject to de novo review. (*Fry, supra,* 245 Cal.App.4th at p. 549; see *Zubarau v. City of Palmdale* (2011) 192 Cal.App.4th 289, 305 [" 'Statutory construction is a question of law for the courts and the rules of statutory construction applicable to statutes are also applicable to local ordinances.' "].)

If a legislative action is deemed to modify vested pension rights, courts then employ the "California Rule" to determine if the modification nevertheless survives contract clause scrutiny. Under the California Rule, " '[a]n employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citations.] Such modifications must be reasonable. . . . To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages." (*Alameda County, supra,* 9 Cal.5th at pp. 1076-1077.)

3. *The portability terms under the Reciprocal Arrangement were not protected as deferred compensation or because they affected pension benefits*

The City Employees contend "the City's requirement [under the Reciprocal Arrangement] that LACERS credit its members for service performed at DWP conferred upon such employees increased deferred compensation" that is entitled to constitutional protection. (See *Cal Fire, supra,* 6 Cal.5th at p. 985 [pension benefits are protected by the contract clause

18

"[g]iven their character as deferred compensation"]; *Alameda County*, *supra*, 9 Cal.5th at p. 1077 ["It is the nature of pension rights as deferred compensation that caused *Kern* to hold them protected under the contract clause."].)  *Cal Fire* is instructive in evaluating whether we should treat the terms under the Reciprocal Arrangement as "deferred compensation" such that the City Employees had a vested right to them.

In *Cal Fire*, the plaintiffs argued a statute allowing state employees to buy up to five years of additional retirement service credit (and thus boost their pension benefits) created a vested right to purchase the credit.  (*Cal Fire*, *supra*, 6 Cal.5th at pp. 969-971.)  The Supreme Court first clarified that the rights of employees who *had already* purchased the service credit were not at issue because those employees "remain[ed] in precisely the same position as they were prior to [the statute's enactment]." (*Id*. at p. 981.)  Instead, the court framed the asserted vested right as the *opportunity to purchase* the service credit.  (*Ibid*.)

The court rejected the theory that the opportunity to purchase service credit was a form of deferred compensation akin to the pension benefits themselves.  (*Cal Fire*, *supra*, 6 Cal.5th at pp. 986-987.)  The court emphasized that "pension benefits, the classic example of deferred compensation, flow directly from a public employee's service, and their magnitude is roughly proportional to the time of that service. . . .  [P]ension benefits are, literally, earned by an employee's work."  (*Id*. at p. 986.)  In contrast, the opportunity to purchase service credit was available to every employee who had worked for at least five years and, if not taken advantage of, expired upon an employee's retirement or termination.  (*Id*. at pp. 986-987.)  Further, "the amount of an eligible employee's service was entirely irrelevant to his or her

19

exercise of the opportunity," as a lengthier period of service did not increase the amount of service credit an employee could purchase. (*Id.* at p. 987.) The opportunity to purchase service credits was "not different in form from a variety of other optional benefits offered to public employees in connection with their work"—including the opportunity to purchase health, life, or long-term disability insurance or create a flexible spending account—that were not protected under the contract clause. (*Ibid.*)

Similarly, the Reciprocal Arrangement did not grant the City Employees the rights to a form of deferred compensation akin to pension benefits. Unlike pension benefits, for which "a critical determinant is an employee's term of public employment" (*Cal Fire*, *supra*, 6 Cal.5th at p. 987), here "the amount of an eligible employee's service was entirely irrelevant to his or her exercise of the opportunity" to avail herself of the perks under the Reciprocal Arrangement (*ibid.*). The opportunity to transfer between DWP and the City and to take advantage of reciprocity between their pension systems was available to employees regardless of years of service. Thus, unlike pension benefits, the opportunity to avail oneself of the terms of the Reciprocal Arrangement is not proportional to years of service, a hallmark of deferred compensation. (Cf. *id.* at p. 985 ["the receipt of pension benefits is granted constitutional protection because the benefits constitute a portion of the compensation awarded by the government to its employees, paid not at the time the services are performed but at a later time"]; *City of San Jose v. Howard Jarvis Taxpayers Assn.* (2024) 101 Cal.App.5th 777, 797 ["the city has an obligation to pay future pension benefits to its current and former employees, who have already earned them"], review

20

granted Aug. 14, 2024, No. S285426.)

The City Employees suggest that the revocation of the Reciprocal Arrangement "undermine[d] the retirement value of work *already performed* by City employees," which distinguishes this case from *Cal Fire* where the benefits at issue, the opportunity to purchase service credits, "had not been earned as a component of the employees' compensation." They assert that if employees transfer from DWP to the City after January 1, 2014, their pension benefits earned at DWP prior to 2014 will be "devalued" as a result of the 2013 Ordinance. The fallacy of the City Employees' argument is that the 2013 Ordinance does not affect an employee's pension benefits in any way unless the employee chooses to transfer after January 1, 2014.[7] The City Employees receive the same retirement credits at DWP for their past work there as before the 2013 Ordinance—they just cannot transfer them, unless they purchase the requisite employer and employee contributions. While the City Employees assert that advancing along certain career paths sometimes requires moving between DWP and other City departments, they concede employees do not have a constitutionally protected right to transfer between DWP and the City. And even assuming the City Employees are correct that employees could face a choice of either being laid off or involuntarily transferred,[8] a public

---

[7] Of course, an employee's ability to transfer is not guaranteed, and depends on various factors such as department needs and the employee's qualifications.

[8] As the superior court noted, the argument employees may be involuntarily transferred lacks support. On appeal, the City Employees cite two pieces of evidence. First, they point to the

21

employee "ha[s] no constitutionally protected right to continue in his position . . . in order to receive a larger retirement allowance." (*Miller v. State of California* (1977) 18 Cal.3d 808, 817 (*Miller*); see *Summers v. City of Cathedral City* (1990) 225 Cal.App.3d 1047, 1065 ["there is no contractual right to the continuation of public employment"]; see also *Kern, supra*, 29 Cal.2d at p. 853 [no "right to tenure" in the absence of special provision].) Thus, if employees choose to transfer, we cannot say any vested right has been impaired.[9]

---

declaration of an employee who notes that career promotions may involve transfers between the City and DWP. But the employee also states there is a pathway for his career that does not require such a transfer. Second, the City Employees refer to provisions of the Charter that allow for temporary appointments in emergencies and provide for "bumping" employees with less seniority to avoid layoffs, "which can have a cascading effect of employees changing positions and departments." (Charter, §§ 1013, 1015.) However, there is no evidence that these provisions have ever resulted in transfers between the City and DWP or that such transfers have had any lasting impact on pension benefits.

[9]     The City Employees suggest that we should treat the terms of the Reciprocal Arrangement as vested rights because DWP is a department that is part of the City of Los Angeles, and thus the transfers at issue involve "multiple retirement systems for a single employer." They provide no authority to support their argument, which in any event is not well-taken. DWP is a "Proprietary Department" of the City that is funded independently and operates autonomously and separately from other City departments. (Charter, §§ 600, subd. (a), 602, 603.) Each of the respective boards for LACERS and WPERP has the "sole and exclusive responsibility to administer its system . . . to

*Miller* is particularly instructive here. In *Miller*, a state employee plaintiff challenged a statute that reduced the mandatory retirement age for his employment category from 70 to 67. (*Miller*, *supra*, 18 Cal.3d at p. 811.) Because the plaintiff had to retire at 67, he lost the opportunity to work several more years and thus achieve the maximum pension benefit that he previously would have been able to obtain. (*Id.* at p. 812.) The Supreme Court examined whether "the reduction in the mandatory age of retirement impair[ed] a vested right of plaintiff to qualify for a larger monthly pension based on service until the age of 70." (*Id.* at p. 811.)

The Supreme Court concluded the reduction in the mandatory age of retirement did not "work an impairment of any vested right." (*Miller*, *supra*, 18 Cal.3d at pp. 815, 817.) "Although his right to a pension based on this system was vested," his right to receive such benefits was subject to the condition that he remain in state employment until age 70. (*Id.* at p. 817) "Plaintiff failed to satisfy that condition since he was lawfully placed on retirement at age 67. Thus, his right to a maximum pension based on retirement at age 70 never matured." (*Ibid.*) Plaintiff did not have a vested right to the maximum pension benefit because he "had no vested contractual right to continue working for any specified period of time." (*Ibid.*) His

---

provide benefits to system participants." (Charter, § 1106, subd. (a)(1).) The fact that these separate retirement systems are both under the umbrella of the City of Los Angeles does not provide a basis to treat DWP and the City as a "single employer," much less to conclude either LACERS or WPERP members have a vested right to transfer between DWP and the City without any effect on their pension.

23

"loss of pension benefits resulted not from an impairment of his vested rights, but from the occurrence of a condition subsequent to the accrual of those rights," i.e., the Legislature's reduction of the age of retirement that "defeated [plaintiff's] expectation of . . . a larger retirement allowance." (*Id.* at pp. 816-817; see also *Kern*, *supra*, 29 Cal.2d at p. 853 ["The fact that a pension right is vested will not, of course, prevent its loss upon the occurrence of a condition subsequent such as lawful termination of employment before completion of the period of service designated in the pension plan."].)

*Miller* aptly demonstrates that a legislative change that has the effect of lowering expected pension benefits does not necessarily amount to an impairment of vested rights. In *Cal Fire*, the Supreme Court relied on *Miller* in holding that a "term and condition of public employment that is otherwise not entitled to protection under the contract clause does not become entitled to such protection merely because it affects the amount of an employee's pension benefit." (*Cal Fire*, *supra*, 6 Cal.5th at p. 992; see *id.* at p. 990 ["We have never held . . . that a particular term or condition of public employment is constitutionally protected solely because it affects in some manner the amount of a pensioner's benefit."].) That the cessation of the Reciprocal Arrangement could affect pension benefits that accrued for pre-2014 service is thus not sufficient to find the employees had a vested right to the terms of the Reciprocal Arrangement.

We conclude any rights employees had under the Reciprocal Arrangement were not vested rights, and the City Council could modify those terms as it did in adopting the 2013

24

Ordinance.[10]  (See *Piombo v. Board of Retirement* (1989)
214 Cal.App.3d 329, 339 ["to the extent respondent had a 'right'
to redeposit and thereby reinstate his pension rights, that right
was statutory in nature and . . . [was] subject to modification by
the Legislature or proper statutory authority. . . .  The fact that
[the Legislature's exercise of its power] defeated his expectation
of having an option to reinstate pension rights . . . did not result
in any impairment of his vested rights"].)  Because the City
Employees have not established a vested contractual right, the
question whether the 2013 Ordinance and suspension of the
Reciprocal Arrangement worked an unconstitutional impairment
of such rights "does not arise," and we need not reach whether
the 2013 Ordinance would pass muster under the California
Rule.  (*Cal Fire*, *supra*, 6 Cal.5th at p. 995; see *Miller*, *supra*,
18 Cal.3d at p. 818 [where court concluded plaintiff suffered no
impairment of vested rights, court "need not undertake the
analysis" whether changes in the state's pension system were
reasonable].)

B.     *The 2013 Ordinance Does Not Violate Sections 4.1102 and*
       *4.1111*

       In addition to retirement benefits, LACERS provides
healthcare benefits to retired employees with at least 10 years of
City service.  (§§ 4.1080.7, subd. (a), 4.1111 subds. (d), (e).)  The
City Employees assert that the 2013 Ordinance, specifically
section 4.1020.1, "requires employees to forfeit retiree healthcare

---

[10]     We need not reach respondents' alternative argument that
the terms of the Reciprocal Arrangement were not vested rights
because they were contingent on DWP's continued participation
in the arrangement.

25

benefits rights when employees use their 4% of vested employee retiree health contribution funds to purchase WPERP service credit," purportedly in violation of sections 4.1102 and 4.1111.

We now lay out the highly technical provisions relied on by the City Employees to make their argument, but note the City Employees have forfeited their claim by failing to provide a cogent argument regarding how the interplay between these provisions led to violations of some employees' rights.[11] (*County of Sacramento v. Singh* (2021) 65 Cal.App.5th 858, 861 ["we may treat a point that is not supported by cogent legal argument as forfeited"]; accord, *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) Moreover, from what we can glean of their argument, its premise is incorrect, because there is no showing employees were required to use their healthcare contribution funds for an improper purpose.

Section 4.1020.1 permits LACERS members to purchase credit for periods of service with DWP. If a member has contributions on deposit with WPERP, the member must authorize a transfer of those contributions to LACERS to be credited towards payment of the service credit. (§ 4.1020.1, subds. (a), (d)(1).) Section 4.1020.1, subdivision (b), provides, "Service purchased under this section shall not count as service or service credit for the purpose of qualifying for any benefits

---

[11] In their reply brief, the City Employees concede "the discussion of this issue in their Opening Brief included errors." They state they "attempt[ed] to more clearly set forth [their] position" on reply, but it does not appear they were successful, because they cite incorrect code sections and still do not set forth a comprehensible argument.

26

provided in [section 4.111]," i.e., a healthcare benefit.  (See § 4.111.)

Section 4.1003, subdivision (c)(2), requires certain members to "contribute by salary deduction to the Retirement Fund an additional four percent (4%) of the member's compensation earnable retroactive to July 1, 2011."  In return, they "shall receive the [healthcare] benefit set forth in Section 4.111(c)." (§ 4.1003, subd. (c).)

Within the LACERS fund is a separate health benefits account that "shall only be used for" healthcare and medical benefits, and its assets "may not be used for retirement . . . benefits."  (§ 4.1102, subds. (a), (d), (e).)

The City Employees' argument appears to rest on the assumption that under section 4.1003, subdivision (c), a member must contribute 4 percent *of transferred WPERP credits* toward healthcare benefits (i.e., benefits under § 4.1111, subd. (c)), while the 2013 Ordinance (§ 4.1020.1, subd. (b)) simultaneously prevents those credits from going toward healthcare benefits. The City Employees also argue the 2013 Ordinance requirement that an employee contribute 4 percent of transferred WPERP credits towards healthcare benefits violates the requirement of section 4.1102 that contributions towards retiree healthcare benefits shall only be used for the payment of healthcare benefits and not for retirement benefits.

However, section 4.1003, subdivision (c), requires employees to contribute 4 percent "of the member's compensation earnable" "*by salary deduction*."  (§ 4.1003, subd. (c)(2), italics added.)  The statute defines "compensation earnable" as "[t]he full salary, wage or compensation established for any position or office in the City service for the particular period involved in any

27

calculation required." (§ 4.1001, subd. (a).)  The neighboring subsections repeatedly reference salary deductions when discussing compensation contributions.  (See § 4.1003, subd. (c).)

Therefore, section 4.1003, subdivision (c), requires an employee to contribute 4 percent of the *employee's salary by deduction*, not 4 percent of purchased retirement credits.  Nor do the City Employees cite any evidence to support their claim that employees must forfeit their contributions toward healthcare benefits to purchase WPERP credit.  The City Employees failed to show that members' contributions toward retiree health benefits were being improperly applied to pension benefits in violation of the Administrative Code.

## DISPOSITION

The judgment is affirmed.  The City Employees and Local 18 are entitled to recover their costs on appeal.


STONE, J.

We concur:


MARTINEZ, P. J.


SEGAL, J.


28